# United States Court of Appeals

## For the Eighth Circuit

_____

No. 12-1834

_____

Midwest Foster Care and Adoption Association; Missouri State Foster Care and
Adoption Board; Wesley Cauveren; Jennifer Cauveren; Kristina DesCombes;
Tyran Murrell; Michael Paulsen; Kay Paulsen

*Plaintiffs - Appellants*

v.

Brian Kincade, Director of the Department of Social Services, in his official
capacity; Candace A. Shively, Director of the Children's Division, in her official capacity

*Defendants - Appellees*

------------------------------

American Civil Liberties Union Foundation of Kansas and Western Missouri;
American Civil Liberties Union of Eastern Missouri; Kansas Foster and Adoptive
Children; Missouri Foster Care and Adoptive Association; The Central Missouri
Foster Care and Adoption Association; The Evan B. Donaldson Adoption
Institute; The North American Council on Adoptable Children; Children's Rights

*Amici on Behalf of Appellants*

State of Alaska; State of Arizona; State of Arkansas; State of Colorado; State of
Hawaii; State of Indiana; State of Kansas; State of Maryland; State of
Massachusetts; State of Michigan; State of Nebraska; State of Nevada; State of
New York; State of North Dakota; State of Rhode Island; State of South Carolina;
State of Utah; State of Washington; State of Wyoming

*Amici on Behalf of Appellees*

_____

Submitted: November 15, 2012
Filed: April 8, 2013
_____

Before SMITH, BEAM, and GRUENDER, Circuit Judges.
_____

GRUENDER, Circuit Judge.

Six individual foster care providers and two organizations representing Missouri foster care providers (collectively, "Providers") brought a suit against officials of the State of Missouri ("the State") who oversee the State's foster care program. The Providers asserted that the Adoption Assistance and Child Welfare Act of 1980 ("CWA"), 42 U.S.C. § 670 *et seq*., gave them a privately enforceable right under 42 U.S.C. § 1983 to receive payments from the State sufficient to cover the cost of certain statutorily enumerated components of foster care. The district court[1] held that the CWA provisions the Providers invoked were not privately enforceable and dismissed their complaint for failure to state a claim. For the reasons discussed below, we affirm the district court.

## I.

The CWA is a piece of Spending Clause legislation that creates a cooperative state-federal program to fund foster care and adoption assistance. *Mo. Child Care*

---

[1]The Honorable Dean Whipple, United States District Judge for the Western District of Missouri.

*Ass'n v. Cross*, 294 F.3d 1034, 1036 (8th Cir. 2002).[2] State expenditures are eligible for partial reimbursement with federal matching funds only if the state incurs them within the constraints set forth in the CWA. A state must enact a plan for organizing and operating its foster care program and then submit the plan to the Secretary of Health and Human Services ("Secretary") for approval. 42 U.S.C. § 671(a). The Secretary must "promulgate regulations for the review of such programs to determine whether" there is "substantial conformity" between the terms of the state plan and federal requirements, as well as between the state plan as written and the way in which it is implemented. 42 U.S.C. § 1320a-2a(a). If "there is a substantial failure to so conform," the Secretary is directed to take corrective measures, including withholding federal matching funds. § 1320a-2a(b). States failing to substantially conform must be given an opportunity to "adopt and implement a corrective action plan, approved by the Secretary," during which time the withholding of federal matching funds is suspended. § 1320a-2a(b)(4).

---

[2]In *Cross*, we analyzed whether the State could invoke its Eleventh Amendment sovereign immunity in defense of a § 1983 suit to enforce provisions of the CWA. We determined that the CWA does not have the type of comprehensive remedial scheme indicative of a congressional intent to foreclose suits brought against state officials in their official capacities for violations of the Constitution or federal law. *Cross*, 294 F.3d at 1039; *see also Ex parte Young*, 209 U.S. 123, 149-59 (1908) (holding that the Eleventh Amendment does not bar suits seeking prospective injunctive relief against state officials in their official capacities for the violation of federal law); *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 74 (1996) ("[W]here Congress has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right, a court should hesitate before casting aside those limitations and permitting an action against a state officer based upon *Ex parte Young*."). The availability of state sovereign immunity was the sole issue presented during the interlocutory appeal in *Cross*, and we did not have occasion to determine which sections of the CWA, if any, could be individually enforced by foster care providers.

One of the required characteristics of each state plan is that it "provides for foster care maintenance payments in accordance with section 672." § 671(a)(1). Section 672, in turn, describes how "[e]ach state" with an approved plan "shall make foster care maintenance payments on behalf of each child who has been removed from the home of a relative . . . if the removal and foster care placement" requirements are met and the child would have otherwise qualified for assistance under the now-defunct Aid to Families with Dependent Children program. § 672(a). Subsection (b) sets forth "[a]dditional qualifications," which limit the individuals or entities eligible to receive foster care maintenance payments. These payments "may be made . . . only on behalf of a child" who is eligible under § 672(a) and is in either "the foster family home of an individual" or "a child-care institution." § 672(b). Three classes of recipients are referenced: individuals, public or private "child-care agenc[ies]," and "child-care institution[s]." *Id.* A state can receive federal matching funds—at a rate equal to its Medicaid matching rate—only for those foster care maintenance payments meeting the foregoing requirements of § 672. *See* § 674(a)(1). Section 675, the "Definitions" section of the CWA, defines "foster care maintenance payments" as:

> payments to cover the cost of (and the cost of providing) food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance with respect to a child, reasonable travel to the child's home for visitation, and reasonable travel for the child to remain in the school in which the child is enrolled at the time of placement. In the case of institutional care, such term shall include the reasonable costs of administration and operation of such institution as are necessarily required to provide the items described in the preceding sentence.

§ 675(4)(A).

The State interprets these CWA provisions as constraining the potential types of payment recipients and imposing a ceiling on the types of expenses for which the

-4-

federal government is willing to provide matching funds. In contrast, under the Providers' reading, § 672(a) endows eligible foster care providers with an individually enforceable federal right to payments sufficient to cover every element of care listed in § 675(4)(A). It is this alleged right they seek to enforce through § 1983, by requesting both a declaratory judgment that the State is violating the CWA through inadequate foster care maintenance payments and an injunction requiring the State to adopt and implement a methodology that will result in a higher, "lawful" level of payments.

"Section 1983 provides a federal cause of action against anyone who, acting pursuant to state authority, violates any 'rights, privileges or immunities secured by the Constitution and laws' of the United States." *Pediatric Specialty Care, Inc. v. Ark. Dep't of Human Servs.*, 293 F.3d 472, 477 (8th Cir. 2002) (quoting 42 U.S.C. § 1983). However, § 1983 holds out a mechanism to vindicate only "the violation of a federal *right*, not merely a violation of federal *law*." *Blessing v. Freestone*, 520 U.S. 329, 340 (1997). "[I]t is *rights*, not the broader or vaguer 'benefits' or 'interests,' that may be enforced under [§ 1983]." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002). Where a statute merely gives individuals a general benefit or enhances their interest in having the state meet its statutory responsibilities, plaintiffs seeking to force compliance with funding conditions must utilize "the typical remedy" of pursuing "action by the Federal Government to terminate funds to the State." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 28 (1981).

In *Blessing*, the Supreme Court created a three-part test for determining whether a statute creates an individually enforceable federal right. This test requires us to analyze whether "(1) Congress intended the statutory provision to benefit the plaintiff; (2) the asserted right is not so 'vague and amorphous' that its enforcement would strain judicial competence; and (3) the provision clearly imposes a mandatory obligation upon the states." *Lankford v. Sherman*, 451 F.3d 496, 508 (8th Cir. 2006) (quoting *Blessing*, 520 U.S. at 340). If a plaintiff demonstrates that a statute meets

all three parts of the *Blessing* test, it is presumptively enforceable under § 1983. *Blessing*, 520 U.S. at 341. Defendants can rebut this presumption by showing either that Congress explicitly foreclosed a remedy under § 1983 or implicitly did so, "by creating a comprehensive enforcement scheme that is incompatible with individual enforcement." *Id.*

After observing some "confusion" among courts applying the *Blessing* test, the Supreme Court subsequently clarified the first prong and "reject[ed] the notion that [its earlier] cases permit anything short of an unambiguously conferred right to support a cause of action brought under § 1983." *Gonzaga*, 536 U.S. at 283; *see also Lankford*, 451 F.3d at 508. Requiring Congress to speak clearly when it intends to create new rights enforceable under § 1983 is no mere tool of convenience. Rather, it reflects the values of "Our Federalism"[3]—often invoked in the implied-right-of-action context—that if a state is to be subject to private suits whenever it fails to meet a funding condition, Congress should clearly put the state on notice. *See Gonzaga*, 536 U.S. at 286 & n.5; *Pennhurst*, 451 U.S. at 17 ("The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.' . . . By insisting that Congress speak with a clear voice, we enable the States to exercise their choice knowingly, cognizant of the consequences of their participation."); *see also Bond v. United States*, 564 U.S. ---, 131 S. Ct. 2355, 2364 (2011) ("Federalism is more than an exercise in setting the boundary between different institutions of government for their own integrity. 'State sovereignty is not just an end in itself: "Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power."'" (quoting *New York v. United States*, 505 U.S. 144, 181 (1992))). Furthermore, this case presents the potential for a federal court to instruct the State's elected

---

[3] *Younger v. Harris*, 401 U.S. 37, 44 (1971) (describing the concept of "Our Federalism" as "a system in which there is sensitivity to the legitimate interests of both State and National Governments").

representatives to increase appropriations to the State's foster care program. Requiring clarity, then, seems particularly prudent. *Cf. Gregory v. Ashcroft*, 501 U.S. 452, 461 (1991) ("This plain statement rule is nothing more than an acknowledgment that the States retain substantial sovereign powers under our constitutional scheme, powers with which Congress does not readily interfere. In a recent line of authority, we have acknowledged the unique matter of state decisions that 'go to the heart of representative government.'" (quoting *Sugarman v. Dougall*, 413 U.S. 634, 647 (1973)). Bearing these principles in mind, we turn to analyzing whether § 672(a) and § 675(4)(A) confer individually enforceable federal rights on the Providers.

## II.

When the Supreme Court applied the first prong of the *Blessing* test in *Gonzaga*, it focused on three factors. First, the Court searched the asserted statutory provisions for "'rights-creating' language," in other words text framed in terms of the individuals who benefit, rather than the persons or institutions that are regulated. *Gonzaga*, 536 U.S. at 287 (quoting *Alexander v. Sandoval*, 532 U.S. 275, 288 (2001)). Second, the Court considered whether the contested statutory language manifested an "'aggregate' focus," instead of being "concerned with 'whether the needs of any particular person have been satisfied.'" *Id.* (quoting *Blessing*, 520 U.S. at 343). Finally, the Court examined whether Congress provided a federal review mechanism. *See id.* at 289-90; *see also 31 Foster Children v. Bush*, 329 F.3d 1255, 1270 (11th Cir. 2003). We analyze the asserted rights-creating provisions through the lens of these factors. Our review of a district court's decision regarding the existence of an individually enforceable federal right is *de novo*. *Ctr. for Special Needs Trust Admin., Inc. v. Olson*, 676 F.3d 688, 699 (8th Cir. 2012).

**A. Rights-creating language**

First, we note the absence of any rights-creating language in the relevant portions of the CWA. "Statutes that focus on the person regulated rather than the individuals protected" do not tend to create enforceable rights. *Gonzaga*, 536 U.S. at 287 (quoting *Sandoval*, 532 U.S. at 289). *Gonzaga* cited Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972 as classic examples of rights-creating language. *See id.* (citing 42 U.S.C. § 2000d ("No person . . . shall . . . be subjected to discrimination"); 20 U.S.C. § 1681(a) (same)). The Court then contrasted the statutory language at issue in *Sandoval*, which described how "each Federal department and agency . . . is authorized and directed to effectuate the provisions of section 2000d." *See id.*; 42 U.S.C. § 2000d-1. *Gonzaga* addressed a section of the Family Educational Rights and Privacy Act of 1974 ("FERPA"), and it viewed the relevant language[4] as more like that of *Sandoval* than Titles VI or IX because the focus—the conditions under which the Secretary of Education is prohibited from disbursing funds to educational institutions—was "two steps removed from the interests of [the] individual students and parents" filing suit. *See Gonzaga*, 536 U.S. at 287.

We view the focus of § 672(a) and § 675(4)(A) as similarly "removed" from the interests of the Providers. Sections 672(a) and 675(4)(A) speak to the states as regulated participants in the CWA and enumerate limitations on when the states'

---

[4]"No funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of permitting the release of education records . . . of students without the written consent of their parents to any individual, agency, or organization . . . ." 20 U.S.C. § 1232g(b)(1). After a school released a student's personal information to a statutorily unauthorized person, the student asserted an individually enforceable right under § 1983 to sue the school for violating FERPA's nondisclosure provision. *Gonzaga*, 536 U.S. at 277.

expenditures will be matched with federal dollars; they do not speak directly to the interests of the Providers.

First, we do not interpret § 675(4)(A) as listing a mandatory set of costs that must be fully covered by a state's foster care maintenance payments in order for the payments to be matched with federal funds. Finding an enforceable right solely within a purely definitional section is antithetical to requiring unambiguous congressional intent. *See 31 Foster Children*, 329 F.3d at 1271 (explaining that where sections "are definitional in nature, they alone cannot and do not supply a basis for conferring rights enforceable under § 1983"). Instead, we construe this list as a ceiling imposed by Congress on the categories of foster care costs eligible for partial federal reimbursement. Section 675(4)(A) is part of an open-ended entitlement program, and when viewed in this context, it seems natural that Congress would choose to place limitations on the type of state expenditures it matches. Prior to the adoption of the CWA in 1980, there was no statutory definition of foster care maintenance payment. H.R. Conf. Rep. 96-900 (1980), *reprinted in* 1980 U.S.C.C.A.N. 1561, 1570. Responding to "general confusion about what *can* be called a foster care maintenance payment," the Senate then crafted a definition, which was codified at § 675(4)(A). S. Rep. 96-336 (1980), *reprinted in* 1980 U.S.C.C.A.N. 1448, 1464 (emphasis added). In sum, the definition of "foster care maintenance payments" found in § 675(4)(A) amounts to a funding condition that limits the expenses for which a state may seek reimbursement.[5]

_____

[5]Indeed, the Secretary also views this provision as a limitation directed at participating states: in the definitional section of the regulations promulgated to implement the CWA, the components of foster care maintenance payments are referred to as "allowable expense[s]." 45 CFR § 1355.20(a). We are cognizant of the responsibility to tether our analysis to congressional intent, rather than an agency's implementing regulations. *See Gonzaga*, 536 U.S. at 283; *see also Save Our Valley v. Sound Transit*, 335 F.3d 932, 939-40 (9th Cir. 2003). However, the Secretary's long-standing interpretation of this enumerated list as a constraint on the scope of a state's claim for matching funds buttresses our own determination that Congress did

Even importing the full definition of "foster care maintenance payments" from § 675(4)(A) into § 672(a), we do not read the resulting conglomeration as embodying rights-creating language entitling the Providers to payments sufficient to cover every delineated cost. The Providers and the dissent place emphasis on only the first portion of § 672(a)(1), which describes how "[e]ach State with a plan approved under this part shall make foster care maintenance payments [as defined in § 675(4)(A)] on behalf of each child . . . ." *See infra* p. 22. Section 672(a)(1) then proceeds, however, to set forth a series of factors that curtail the situations in which state plans "shall make foster care maintenance payments": the child must have been "removed from the home of a relative specified in section 606(a)"; both the removal and foster care placement must have met, and continue to meet, the requirements of § 672(a)(2); and the child must be one who would have met the income-related eligibility requirements in § 672(a)(3). Thus, although § 672(a)(1) requires participating state plans to remit foster care maintenance payments in certain contexts, the overwhelming focus is upon the conditions precedent that trigger this obligation. The function of § 672(a) is to serve as a roadmap for the conditions a state must fulfill in order for its expenditure to be eligible for federal matching funds; otherwise, the state bears the full cost of these payments.[6] *See* § 674(a)(1) (describing how states with approved plans are

not use rights-creating language.

[6]The dissent cites *Wagner* for the proposition that "a state must 'make foster care maintenance payments "on behalf of each child" qualifying for foster care.'" *Infra* p. 22 (quoting *Wagner*, 624 F.3d at 979-80). To the extent this implies that the CWA requires the State to make foster care maintenance payments to providers on behalf of each child who qualifies for care under the *state's* foster care program, we disagree. Section 671(a)(1) requires state plans to make foster care maintenance payments "in accordance with section 672." In turn, § 672(a) requires states to make foster care maintenance payments only on behalf of those children who meet the statutory restrictions. The dissent seems to implicitly concede this point when it subsequently remarks that "the state may only make 'foster care maintenance payments . . . on behalf of a *qualifying* child.'" *Infra* p. 22 (omission in original) (emphasis added) (quoting *Wagner*, 624 F.3d at 980). Nor are the CWA's limitations

-10-

entitled to receive federal matching funds for "the total amount expended . . . as foster care maintenance payments under section 672"). The title of § 672(a)(1), "Eligibility," is thus an apt descriptor of the subsection's focus—it sets forth limitations on when a foster care maintenance payment is eligible for partial federal reimbursement. The remainder of § 672(a) defines and expands upon the eligibility limitations in § 672(a)(1). The asserted provisions inescapably serve to establish restrictions on the state foster care expenditures that will be eligible for federal matching. This focus on the states as regulated entities evinces, as in *Gonzaga*, a degree of removal from the interests of the Providers.

The Providers argue that *Wilder v. Virginia Hospital Ass'n*, 496 U.S. 498 (1990), compels a finding of an individually enforceable right. Our contrary conclusion, however, does not contradict *Wilder*. In *Wilder*, the Supreme Court analyzed text from section 1902(a)(13) of the Medicaid Act, as amended by the Boren Amendment: "A State plan for medical assistance must provide . . . for payment [of medical services] through the use of rates . . . which the State finds . . . are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards . . . ." *Wilder*, 496 U.S. at 502-03 (quoting 42 U.S.C. § 1396a(a)(13)(A) (emphasis removed)). The Court interpreted section 1902(a)(13) of the Medicaid Act as giving health care providers an individually enforceable right to reimbursement from participating states at "reasonable and adequate" rates. *Id.* at 515. Both *Wilder*

merely pro forma conditions. During the years 1999-2001, foster care for an average of only 43.7 percent of the foster children in Missouri was eligible for federal subsidy. The remaining foster children were supported solely through state or local funds. Staff of H. Comm. on Ways and Means, 108th Cong., Background Material and Data on the Programs Within the Jurisdiction of the Comm. on Ways and Means, § 11-20, *available at* http://www.gpo.gov/fdsys/pkg/GPO-CPRT-108WPRT108-6/pdf/GPO-CPRT-108WPRT108-6-2-11.pdf.

and this case involve state-federal matching programs in which state payments to the providers of certain services must fulfill statutory requirements in order to be eligible for federal matching. And as in the CWA, the health care providers filing suit were referenced only insofar as they were the *sub silentio* recipients of the payments discussed. But unlike the CWA sections at issue here, the relevant provisions in the Medicaid Act did not focus on defining the conditions that must be met in order for a participating state's expenditures to be eligible for federal matching funds and, therefore, did not evince the degree of removal we now confront.

The dissent and our colleagues on the Ninth Circuit identified a congressional intent that foster parents *benefit* from the receipt of foster care maintenance payments. *See Cal. State Foster Parent Ass'n v. Wagner*, 624 F.3d 974, 981 (9th Cir. 2010); *infra* p. 23 (quoting *Wagner*, 624 F.3d at 979). We do not disagree with this finding, but we do diverge as to its consequence. The ability to locate a nexus between § 1983 plaintiffs and a benefit conferred by a statute is necessary but not sufficient; the statutory text also "must be 'phrased in terms of the persons benefitted.'" *Gonzaga*, 536 U.S. at 284 (quoting *Cannon v. Univ. of Chi.*, 441 U.S. 677, 692 n.13 (1979); *see also Walters v. Weiss*, 392 F.3d 306, 313 (8th Cir. 2004) (holding that 42 U.S.C. § 657(a) does not create an individually enforceable federal right, even though "§ 657(a) reflects some congressional intent to benefit custodial parents"). This requirement ensures that § 1983 is available only to those asserting a violation of federal rights, rather than federal laws. Section 1983 is not a quasi-*qui tam* mechanism, capable of being leveraged by individuals "within the [statute's] general zone of interest" into a vehicle for policing state compliance with federal programs. *See Gonzaga*, 536 U.S. at 283. The unmistakable focus of § 672(a) and § 675(4)(A) on the states as regulated participants in this federal cost-sharing program precludes us from finding that these provisions are "phrased in terms of the [Providers]." *See id.* at 284. Where the statutory language primarily concerns itself with commanding how states are to function within a federal program, the statute is less likely to have created an individually enforceable right. *See Walters*, 392 F.3d at 313 (finding no

-12-

individually enforceable right to "strict compliance with [the] terms" of 42 U.S.C. § 657 because the statute "focuses on the relationships between different federal programs and provides guidelines for state agencies").

**B. Aggregate focus**

Statutes with an "aggregate," rather than an individual, focus "cannot 'give rise to individual rights.'" *Gonzaga*, 536 U.S. at 288 (quoting *Blessing*, 520 U.S. at 344). Examining both "the text and structure" of the asserted provisions, as *Gonzaga* instructs us to do, *id.* at 286, we discern an aggregate focus "not concerned with 'whether the needs of any particular [foster care provider] have been satisfied.'" *See id.* at 288 (quoting *Blessing*, 520 U.S. at 343).

Because the State has "availed itself of the funds offered by Congress through the CWA," it must comply with the CWA's funding conditions, including the creation of a state plan for foster care provision that contains § 671(a)'s "[r]equisite features" and is approved by the Secretary.[7] *Cross*, 294 F.3d at 1036. A statutory provision located in Title 42, Chapter 7—which encompasses the CWA—cannot be deemed individually unenforceable solely because of its situs in a larger regime "requiring a State plan or specifying the required contents of a state plan" (the so-called "*Suter* fix"). 42 U.S.C. § 1320a-2; *see also Carson P. ex rel. Foreman v. Heineman*, 240 F.R.D. 456, 538-39 (D. Neb. 2007). Thus, a statute could not be considered to have an aggregate focus simply because, as here, it requires states to engineer a plan governing their participation in a federal matching program that inures to the advantage of an entire group of beneficiaries.

---

[7]The State's Department of Social Services is the designated administrator of the State's plan and is responsible for ensuring the State's compliance with the CWA. *Cross*, 294 F.3d at 1036 (citing Mo. Rev. Stat. §§ 207.010, 207.060, 660.010 (2000)).

But when a statute links funding to substantial compliance with its conditions—including forming and adhering to a state plan with specified features—this counsels against the creation of individually enforceable rights. *See Gonzaga*, 536 U.S. at 288. As in *Gonzaga*, the federal funding tied to the asserted CWA provisions is conditioned on a backstop substantial compliance requirement. Perfect compliance is not demanded, but states risk diminution or termination of funding if they fail to be "in substantial conformity" with the CWA's funding conditions. *See* § 1320a-2a. A substantial compliance regime cuts against an individually enforceable right because, even where a state substantially complies with its federal responsibilities, a sizeable minority of its beneficiaries may nonetheless fail to receive the full panoply of offered benefits. Focusing on substantial compliance is tantamount to focusing on the aggregate practices of a state funding recipient. Nevertheless, *Wilder* identified an enforceable right to "reasonable and adequate" reimbursement rates, despite a substantial compliance requirement in the Medicaid statute. *See* 42 U.S.C. § 1396c. Thus, while a substantial compliance regime may suggest an absence of the requisite congressional intent, it cannot by itself establish an aggregate focus. *See Sabree ex rel. Sabree v. Richman*, 367 F.3d 180, 192 (3d Cir. 2004).

In addition to the existence of a substantial compliance funding condition, another indicator of an aggregate focus occurs where "each . . . reference to [the asserted individual right] is in the context of describing the type of [action] that triggers a funding prohibition." *Gonzaga*, 536 U.S. at 288-89 (citing § 1232g(b)(1)-(2)). For example, FERPA mandated that "[n]o funds shall be made available" to educational institutions with a certain "policy or practice" of releasing student information. *Id.* at 279. Correspondingly, the ostensible rights-creating language in *Gonzaga* was couched in terms of the recipient behaviors that would be deemed inconsistent with a claim to funding under the statute, and this contributed to the Court's conclusion that the asserted right was not individually enforceable.

-14-

Where the Supreme Court has found individually enforceable rights, they have not been ensconced by references to actions that trigger such a funding prohibition. For example, the relevant statutory language in *Wilder* did not mention "reasonable and adequate" Medicaid reimbursement rates in the context of actions that would cause a state to lose Medicaid funding. *See Wilder*, 496 U.S. at 502-03 (quoting 42 U.S.C. § 1396a(a)(13)(A)). Instead, the statute discussed the rates in terms of ensuring that the amounts would be sufficient to allow efficient health care providers to meet quality-of-care requirements imposed by other state and federal laws and regulations. The statutory provision the Court found enforceable in *Wright v. City of Roanoke Redevelopment & Housing Authority*, 479 U.S. 418 (1987), is similar to *Wilder* in this regard. The Brooke Amendment to the United States Housing Act stated that a family living in a public housing project "shall pay as rent . . . the highest of the following amounts." *Wright*, 479 U.S. at 420 & n.2 (1987) (quoting Pub. L. No. 97-35, § 322, 95 Stat. 357, 400 (1981)). Again, the asserted right to pay no more than the statutorily specified amounts was not situated within a discussion of the actions by local public housing authorities that would trigger prohibitions on their claims to federal matching funds.

In this regard, we view § 672(a) and § 675(4)(A) to be more like the statutory language at issue in *Gonzaga* than that of the statutes at issue in *Wilder* or *Wright*.[8] Admittedly, § 672(a) and § 675(4)(A) do not explicitly proclaim "no funds shall be

[8]The dissent goes to great lengths to point out that *Wilder* remains good law. *Infra* pp. 23-24. We agree of course, but we find *Wilder* to be distinguishable. As we have discussed, two distinctions are particularly relevant. First, the CWA provisions at issue fail to use rights-creating language because they focus on the rules governing state participation, which bears a degree of removal from the interests of the Providers. *See supra* p. 11. Second, as the previous paragraph explains, the payments in *Wilder* were not, as here, discussed in the context of conditions that would trigger program funding restrictions. Although the dissent avers that *Wilder* should not be "so easily set aside," the balance of the dissent's critique involves the district court's treatment of *Wilder*, rather than our own. *See infra* pp. 23-24.

-15-

made available to match a state's foster care maintenance payments if the state has certain reimbursement policies or practices," as the exact analogue of the statute at issue in *Gonzaga* would. *See Gonzaga*, 536 U.S. at 279. But in effect they do just that, by saying "[e]ach state . . . shall make foster care maintenance payments on behalf of each child . . . if" certain subsequently enumerated conditions are met, and § 674(a)(1) establishes that matching funds are not otherwise available. In other words, the failure to meet the requirements of § 672(a) "triggers a funding prohibition," and the asserted right is only mentioned in the context of these funding prohibitions. This is further evidence of an aggregate focus.[9]

### C. Federal enforcement mechanism

Finally, *Gonzaga* found that the existence of a centralized federal review mechanism for individuals asserting statutory violations further weighed against a congressional intent to create individually enforceable rights through the courts. *Gonzaga*, 536 U.S. at 289-90. In contrast, although the CWA "provides for oversight and funding restrictions that may be imposed by the Secretary" on the participating states, there is no direct federal review of the claims of individual providers. *Cross*, 294 F.3d at 1038. Instead, the CWA delegates oversight of individual grievances to the states. State plans are required to offer administrative review opportunities to "any individual whose claim for benefits . . . is denied or is not acted upon with reasonable promptness." § 671(a)(12). Additionally, each state plan must "provide[] for periodic review of . . . amounts paid as foster care maintenance payments . . . to assure their continuing appropriateness." § 671(a)(11). Federal review is limited to

---

[9]The dissent points out that as a result of the *Suter* Fix, § 672(a) and § 675(4)(A) cannot be held individually unenforceable merely because they are "embedd[ed] . . .into 'the requirements for a state plan.'" *Infra* p. 23 (quoting *Connor B. ex rel. Vigurs v. Patrick*, 771 F. Supp. 2d 142, 171 (D. Mass. 2011)). We have not argued otherwise. *See supra* p. 14. Instead, as we have discussed, other factors persuade us that these CWA provisions have an aggregate focus.

-16-

auditing states for substantial compliance with these and other requirements. *See* § 1320a-2a.

Despite the relative lack of federal review opportunities, however, the other elements of *Gonzaga*'s analysis of *Blessing*'s first prong strongly tilt against the finding of an unambiguous intent to create an individually enforceable right. We reject the notion that a failure to provide a federal enforcement mechanism equal to the one considered in *Gonzaga* is sufficient to overcome the weight of these competing considerations. *See 31 Foster Children*, 329 F.3d at 1273. Because the Providers have failed to show a "clear and unambiguous" congressional intent to the asserted right, we need not analyze the remaining *Blessing* factors. *See Gonzaga*, 536 U.S. at 290-91.

### III.

We respect the important service the Providers are conferring upon their communities and the children in their care. But, as with most legislation enacted pursuant to the Spending Clause, the Providers' federal remedy is to seek termination of matching funds as a consequence for a state's shortcomings. The Providers argue that the Secretary has failed to review adequately the State's plan or impose sanctions for nonconformity, relegating them to the pursuit of other means of enforcing compliance. But the manner in which the Secretary has chosen to oversee this federal matching program has little bearing on the task at hand. Our job is to determine whether Congress, in enacting the CWA, evinced a clear intent to grant foster care providers an individually enforceable right to foster care maintenance payments sufficiently large to cover the cost of each item enumerated in § 675(4)(A). We hold that Congress did not unambiguously confer such a right and, therefore, we affirm the district court's dismissal of the Providers' complaint for failure to state a claim.

SMITH, Circuit Judge, dissenting.

I respectfully dissent from the majority's holding that the CWA provisions at issue do not confer upon the Providers "a privately enforceable right under 42 U.S.C. § 1983 to receive payments from the State sufficient to cover the cost of certain statutorily enumerated components of foster care." Consistent with the majority of courts to have addressed the issue, I would "hold that §§ 672(a) and 675(4)(A) of the [CWA] establish a presumptively enforceable right under § 1983 to foster care maintenance payments from the State that cover the cost of the expenses

enumerated in § 675(4)(A)." *Wagner*, 624 F.3d at 982.[10] Therefore, I would reverse the district court's dismissal of the Providers' complaint for failure to state a claim.

## I. *Discussion*

"Section 1983 imposes liability on anyone who, under color of state law, deprives a person 'of any rights, privileges, or immunities secured by the Constitution and laws.'" *Blessing*, 520 U.S. at 340 (quoting 42 U.S.C. § 1983). The Supreme Court has recognized that § 1983 "safeguards certain rights conferred by federal statutes."

[10] *See also Foster Parents Ass'n of Wash. State v. Dreyfus*, No. C11-5051 BHS, 2013 WL 496062, at *3 (W.D. Wash. Feb. 7, 2013) (slip copy) (holding that "[t]he expenses are clear and the right to reimbursement is clear" under §§ 672(a) and 675(4)(A); therefore, foster parents had a federal right to enforce); *Sam M. ex rel. Elliott v. Chafee*, 800 F. Supp. 2d 363, 387 (D.R.I. 2011) (agreeing with the "conclu[sion] that the [CWA] provisions [of §§ 672(a)(1) and 675(4)(A)] satisf[y] all three *Gonzaga* factors and, therefore, create privately enforceable rights to case plans and foster care maintenance payments"); *Connor B. ex rel. Vigurs v. Patrick*, 771 F. Supp. 2d 142, 172 (D. Mass. 2011) ("[A]pplication of the *Gonzaga* factors makes it clear that Congress intended to create privately enforceable rights to . . . foster care maintenance payments under the [CWA]."); *C.H. v. Payne*, 683 F. Supp. 2d 865, 877 (S.D. Ind. 2010) (agreeing with "the majority of the[ ] courts" that "§ 672(a)(1) creates rights enforceable by foster parents and foster children under § 1983"); *Cal. Alliance of Child & Family Servs. v. Allenby*, 459 F. Supp. 2d 919, 925 (N.D. Cal. 2006) ("[T]he court concludes that CWA confers an individual right on [foster care service providers] for enforcement of the foster care maintenance payments pursuant to section 675(4)(A)."); *Kenny A. ex rel. Winn v. Perdue*, 218 F.R.D. 277, 303 (N.D. Ga. 2003) (granting plaintiffs' motion for leave to file amended complaint to add claim that state defendants violated "plaintiffs' and class members right to live in foster care placements that have the capacity to provide for the essential needs and services of children in their care by receiving adequate foster care maintenance payments under 42 U.S.C. §§ 671(a)(1), 672(a) and (b), 675(4)(A) and (B), and 45 C.F.R. § 1355.20" after concluding that CWA "provisions . . . do create privately enforceable rights"); *Mo. Child Care Ass'n v. Martin*, 241 F. Supp. 2d 1032, 1042 (W.D. Mo. 2003) ("[T]he [c]ourt concludes that Congress intended there to be a private right of action under §§ 672 and 675 of the CWA.").

*Id.* "In order to seek redress through § 1983, however, a plaintiff must assert the violation of a federal *right*, not merely a violation of federal *law*." *Id.* To "determin[e] whether a particular statutory provision gives rise to a federal right," *id.*, the Supreme Court has directed courts to analyze the following three factors:

> First, Congress must have intended that the provision in question benefit the plaintiff. *Wright*, 479 U.S., at 430, 107 S. Ct., at 773–774. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence. *Id.*, at 431–432, 107 S. Ct., at 774–775. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms. *Wilder*, *supra*, at 510–511, 110 S. Ct., at 2517–2518; *see also Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 17, 101 S. Ct. 1531, 1539–1540, 67 L. Ed. 2d 694 (1981) (discussing whether Congress created obligations giving rise to an implied cause of action).

*Id.* at 340–41.

If a plaintiff shows that a federal statute satisfies these three *Blessing* criteria, then "there is . . . a rebuttable presumption that the right is enforceable under § 1983." *Id.* at 341. "[O]ur inquiry focuses on congressional intent"; therefore, a court properly dismisses a claim where "Congress 'specifically foreclosed a remedy under § 1983.'" *Id.* (quoting *Smith v. Robinson*, 468 U.S. 992, 1005 n.9 (1984)). "Congress may do so expressly, by forbidding recourse to § 1983 in the statute itself, or impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." *Id.* In the present case, Congress did not expressly forbid § 1983 actions related §§ 672 and 675 of the CWA.

## A. *First* Blessing *Factor—Benefit to Plaintiff*

The Supreme Court has "reject[ed] the notion that [its] cases permit anything short of an unambiguously conferred right to support a cause of action brought under § 1983." *Gonzaga*, 536 U.S. at 283. According to the Court, although the inquiry into whether a plaintiff may enforce a statutory violation through § 1983 is different from whether the court can imply a private right of action from a statute, "the inquiries overlap in one meaningful respect—in either case we must first determine whether Congress *intended to create a federal right*." *Id*. "For a statute to create such private rights, its text must be 'phrased in terms of the persons benefited.'" *Id*. at 284 (quoting *Cannon*, 441 U.S. at 692 n.13). Thus, the plaintiff must show that the "statute 'confer[s] rights on a particular class of persons.'" *Id*. at 285 (alteration in original) (quoting *California v. Sierra Club*, 451 U.S. 287, 294 (1981)). "A court's role in discerning whether personal rights exist in the § 1983 context should therefore not differ from its role in discerning whether personal rights exist in the implied right of action context." *Id*. "Accordingly, where the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit, whether under § 1983 or under an implied right of action." *Id*. at 286.

In *Gonzaga*, the Court "laid out a three-part test to determine whether a provision creates a 'right' that is enforceable under § 1983." *Patrick*, 771 F. Supp. 2d at 167. The first consideration is "whether the provision contains 'rights-creating language.'" *Id*. at 168 (quoting *Gonzaga*, 536 U.S. at 287). The second consideration is "whether the provision had an aggregate as opposed to an individualized focus." *Id*. (citing *Gonzaga*, 536 U.S. at 287). The third consideration is "whether the statute contains another enforcement mechanism through which an aggrieved individual can obtain review." *Id*. (citing *Gonzaga*, 536 U.S. at 289–90).

-21-

Applying these considerations I "conclude that Congress intended for §§ 672(a) and 675(4)(A) to benefit Foster Parents as the caregivers for foster children." *Wagner*, 624 F.3d at 979.

Section 672(a)–(c) "unambiguously designates foster parents as one of three types of recipients who can receive funds on foster children's behalf." *Id*. First, a state must "make foster care maintenance payments 'on behalf of each child' qualifying for foster care." *Id*. at 979–80 (quoting 42 U.S.C. § 672(a)). Second, the state may only make "foster care maintenance payments . . . on behalf of a qualifying child . . . to (1) an 'individual' providing a 'foster family home'; (2) 'a public or private child-placement or child-care agency'; or (3) a 'child-care institution.'" *Id*. at 980 (quoting 42 U.S.C. § 672(b)). Third, "[§] 672(c) defines a 'foster family home' as 'foster family home for children which is licenced by the State in which it is situated . . . .'" *Id*. (alteration in original) (quoting 42 U.S.C. § 672(c)). Therefore, reading § 672 in its totality "establishes that participating states must make foster care maintenance payments on behalf of each child to a foster care provider such as individual foster parents." *Id*.; *see also Patrick*, 771 F. Supp. 2d at 171 (concluding that the "first *Gonzaga* factor requir[ing] 'rights-creating language'" was satisfied because the "directives [in § 672] are both couched in mandatory terms and are unmistakably focused on the benefitted class, *i.e.*, foster children").

This case meaningfully differs from "*Gonzaga*, where the Supreme Court held that the language of [FERPA] did not create an enforceable right." *Wagner*, 624 F.3d at 980 (citing 536 U.S. at 276); *see also* 20 U.S.C. § 1232g(b)(1) ("No funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of permitting the release of education records . . . of students without the written consent of their parents to any individual, agency, or organization . . . ."). In that case, the Court concluded that FERPA was not "focus[ed] . . . on individual beneficiaries" but instead targeted "the 'person regulated'—educational agencies and institutions—rather than the 'individuals

-22-

protected'—the students and their families." *Wagner*, 624 F.3d at 980 (quoting *Gonzaga*, 536 U.S. at 287). FERPA had an "'aggregate focus' on 'institutional policy and practice' rather than focusing on 'individual instances' of noncompliance." *Id*. (quoting *Gonzaga*, 536 U.S. at 288).

Unlike FERPA, "§ 672 of the CWA focuses squarely on the individuals protected, rather than the entities regulated." *Id*. It is not "regulat[ing] state institutions" but instead focused on states making "payments 'on behalf of each child,' payments which are directed to foster parents pursuant to § 672(b)." *Id*. "'In contrast [to FERPA], the CWA contemplates payments *directly to providers*, and the providers seek enforcement of that right.'" *Id*. (emphasis added) (alteration in original) (quoting *Allenby*, 459 F. Supp. 2d at 924).

Moreover, § 672(a)(1) has an individual focus—"'payments on behalf of *each* child'"—as opposed to an aggregate focus. *Id*. (quoting 42 U.S.C. § 672(a)(1)). "Section 672(a)'s focus on individual foster children and § 672(b)'s specific language designating foster care providers to receive payments on foster children's behalf together unambiguously reflect Congress's intent that foster care maintenance payments benefit individual foster parents." *Id*. at 981. Congress's embedding of these provisions into "'the requirements for a state plan'" does not mean these provisions cannot also create an individual right. *Patrick*, 771 F. Supp. 2d at 171 (quoting *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 74 (1st Cir. 2005) ("The mere fact that all the Medicaid laws are embedded within the requirements for a state plan does not, by itself, make all of the Medicaid provisions into ones stating a mere institutional policy or practice rather than creating an individual right.")).

In holding that no rights-creating language exists in the CWA, the majority attempts to distinguish *Wilder*. *See supra* Part II.A. *Wilder*, however, is not so easily set aside. "In that case, the Supreme Court gave VA hospitals the right to sue in federal court under § 1983 to obtain reimbursement for the cost of providing medical

services to indigents as mandated by the Medicaid Act." *Martin*, 241 F. Supp. 2d at 1040. The *Gonzaga* Court explained that, in *Wilder*, it permitted "a § 1983 suit brought by health care providers to enforce a reimbursement provision of the Medicaid Act, on the ground that the provision . . . explicitly conferred specific monetary entitlements upon the plaintiffs." *Gonzaga*, 536 U.S. at 280. The Supreme Court *did not* overrule *Wilder* in *Gonzaga*. *See Martin*, 241 F. Supp. 2d at 1041 ("If the Supreme Court had intended to overrule *Wilder*, one would expect the criticisms or clarification to be directed at *Wilder* and not *Blessing* and *Suter*.").

> The CWA, like the Medicaid statute in *Wilder*, *explicitly confers monetary entitlements on the foster care institutional providers* and evidences Congress'[s] intent to permit those foster care institutions to enforce their rights in federal court using § 1983. While the ultimate beneficiaries of the Medicaid statute were the indigents who received medical services, the Supreme Court in *Wilder* found that the hospitals had a right to be paid according to the terms of the statute and could use § 1983 to enforce that right. Similarly, while the ultimate beneficiaries of the CWA are the foster children, Congress mandated that foster care providers should recover their costs, thereby creating a similar right of enforcement recognized in *Wilder*. Furthermore, in both the CWA and the Medicaid statute, the reference to costs focuses on the institutions and not the children. Congress must have recognized that if costs were not covered, reputable foster care service would eventually not be available. Congress would also have been aware that as a general proposition foster care institutions, not foster children, would be in a better position to enforce those rights, thereby ensuring the continued implementation of congressional intent.

*Id*. (emphasis added).[11]

---

[11]The district court criticized *Martin*'s reliance on *Wilder*, stating that "*Martin* believed that the *Wilder* analysis remained sound because *Gonzaga* did not levy any 'criticisms or clarification' at it." (Quoting *Martin*, 241 F. Supp. 2d at 1041.) It concluded that *Gonzaga* rejected the test applied in *Wilder* "'in favor of the narrower

Finally, as the majority concedes, the CWA does not contain an alternative enforcement mechanism. *See supra* Part II.C. "Unlike the FERPA [at issue in *Gonzaga*], the CWA provides no administrative means through which a foster parent may ask the State to make foster care maintenance payments that cover the mandatory costs." *Wagner*, 624 F.3d at 982. The lack of an "administrative forum in which [foster parents may] raise their concerns lends additional support to [the] conclusion that Congress intended to create an enforceable right here, just as the presence of an administrative mechanism 'buttressed' the Supreme Court's opposite conclusion in *Gonzaga*." *Id*. (citing *Gonzaga*, 536 U.S. at 289–90); *see also Patrick*, 771 F. Supp. 2d at 172 ("While Defendants argue that the [CWA] establishes a 'comprehensive review and enforcement infrastructure' by requiring periodic review to determine which states are in substantial conformity with the Act, . . . this purely institutional review process is not the same as an individualized enforcement mechanism.").

I conclude that "[t]he first *Blessing* factor therefore militates in favor of the creation of an enforceable right." *Wagner*, 624 F.3d at 981.

## B. *Second* Blessing *Factor—Vagueness of Right*

"The second *Blessing* factor asks whether the plaintiff has demonstrated that the asserted right is not so vague and amorphous that its enforcement would strain judicial competence." *Wagner*, 624 F.3d at 981 (quotation and citation omitted). I

---

'unambiguously conferred right' analysis that now governs.'" (Quoting *Minn. Pharmacists Ass'n v. Pawlenty*, 690 F. Supp. 2d 809, 818 n.5 (D. Minn. 2010) (concluding that "it is clear that [*Gonzaga*] rejected some implications of *Wilder*").) "While the analysis and decision of the District Court may reflect the direction that future Supreme Court cases in this area will take," given that the Court did not overrule *Wilder* in *Gonzaga* and that it is comparable to the present case, I conclude that "currently binding precedent supports" reversal of the district court. *See Sabree ex rel. Sabree v. Richman*, 367 F.3d 180, 194 (3d Cir. 2004) (Alito, J., concurring).

conclude that § 675(4)(A)'s "itemized list of expenses" creates a "sufficiently specific" right. *Id*.

Section 675(4)(A) of 42 U.S.C. provides that

[t]he term "foster care maintenance payments" means payments to cover the cost of (and the cost of providing) food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance with respect to a child, reasonable travel to the child's home for visitation, and reasonable travel for the child to remain in the school in which the child is enrolled at the time of placement. In the case of institutional care, such term shall include the reasonable costs of administration and operation of such institution as are necessarily required to provide the items described in the preceding sentence.

"[C]ourts may review the State's compliance with a requirement to set rates that cover the costs of the enumerated expenditures." *Wagner*, 624 F.3d at 981. Although the statute "does not prescribe a particular methodology for calculating costs, [courts may] give deference to a reasonable methodology employed by the State." *Id*. (citing *Wilder*, 496 U.S. at 518–19). The lack "of a uniform federal methodology for setting rates 'does not render the [statute] unenforceable by a court.'" *Id*. (alteration in original) (quoting *Wilder*, 496 U.S. at 519).

The majority of "courts considering the combined effect of §§ 672(a) and 675(4)(A) have also concluded that the asserted right satisfies *Blessing*'s second factor." *Id*. (citing *Payne*, 683 F. Supp. 2d at 878 ("The statute explicitly requires any State with an approved plan to provide payments on behalf of eligible foster children to cover the specific costs listed in § 675(4)(A). In our view, the language contained in § 672(a)(1) is the type of rights-creating language referenced in *Gonzaga*. The right to reimbursement is couched in mandatory terms (providing that each State with an approved plan 'shall' make foster care maintenance payments) and is neither vague

-26-

nor amorphous as the statute clearly enumerates the items and services the payments are required to cover."); *Allenby*, 459 F. Supp. 2d at 925 ("[S]ection 675(4)([A]) contains an explicit and detailed provision for determining payments to foster care providers."); *Martin*, 241 F. Supp. 2d. at 1041 ("Payments [in § 675(4)(A)] are based either on itemized costs or reasonable overhead, issues routinely entrusted to the judiciary in both statutory and common law actions.")); *see also Chafee*, 800 F. Supp. 2d at 388 (explaining that § 675(4)(A) "contains very specific requirements . . . for foster care maintenance payments" and that "§ 672(a)(1) . . . requires that each State with an approved plan '*shall* make foster care maintenance payments on behalf of each child' who has been removed into foster care"); *Perdue*, 218 F.R.D. at 303 ("Although the actual costs of certain basic child care necessities such as food, clothing, and shelter may vary, the Court is equipped to determine whether the current foster care maintenance rates fall outside the range of reasonable payments necessary to provide adequate care for children in Fulton and DeKalb Counties.").

I would hold that the second *Blessing* factor is satisfied.

### C. *Third* Blessing *Factor—Mandatory Obligation upon the States*

"The third and final *Blessing* factor requires that the provision giving rise to the right is couched in mandatory, rather than precatory, terms." *Wagner*, 624 F.3d at 982 (quotation and citation omitted). Here, § 672(a)(1) provides that "[e]ach State with a plan approved under this part *shall* make foster care maintenance payments." (Emphasis added.) Thus, it "require[s] that grantee states make payments to identified beneficiaries." *Wagner*, 624 F.3d at 982. Therefore, I conclude that the third *Blessing* factor is satisfied.

### II. *Conclusion*

As have the majority of courts, I would hold "that §§ 672(a) and 675(4)(A) of the [CWA] establish a presumptively enforceable right under § 1983 to foster care maintenance payments from the State that cover the cost of the expenses enumerated

-27-

in § 675(4)(A)." *Id*. Although I recognize that this right "is only 'presumptively enforceable' by § 1983," I conclude that "the State has not rebutted the presumption, because the statute contains no express prohibition on enforcement, and there is no administrative mechanism through which aggrieved foster parents can seek redress for inadequate maintenance payments." *Id*. Thus, the Providers "have access to a remedy under § 1983 to enforce their federal right." Accordingly, I would reverse the district court's dismissal of the Providers' complaint.

---