# In the
# United States Court of Appeals
## for the Second Circuit

————

AUGUST TERM 2017

No. 14-2919-cv

NEW YORK STATE CITIZENS' COALITION FOR CHILDREN,
*Appellant*,

v.

SHEILA J. POOLE, ACTING COMMISSIONER FOR THE NEW YORK STATE OFFICE OF
CHILDREN AND FAMILY SERVICES, IN HIS OFFICIAL CAPACITY,
*Appellee*,

————

On Appeal from the United States District Court
for the Eastern District of New York

————

ARGUED: JUNE 15, 2015
DECIDED: APRIL 19, 2019

————

Before: CALABRESI, LIVINGSTON, *Circuit Judges*, and SESSIONS, District Judge.*

————

*The Honorable William K. Sessions, III, of the United States District Court for the
District of Vermont, sitting by designation.

————————

Plaintiff, the New York State Citizens' Coalition for Children, sues Defendant, the Acting Commissioner for the New York State Office of Children and Family Services, on behalf of the Coalition's foster parent members. The Coalition alleges that the State pays its foster parents members inadequate rates to cover the costs of caring for their foster children, in violation of the Adoption Assistance and Child Welfare Act of 1980. The district court dismissed the suit, holding that the Act does not create an enforceable right to payments, but finding that the Coalition does have standing to sue. We AFFIRM the finding that the Coalition has standing to sue on behalf of its members under *Nnebe v. Daus*, 644 F.3d 147 (2d Cir. 2011) and reject the State's argument that the Coalition is barred by the third-party standing rule. We REVERSE the district court's dismissal of the Coalition's claims and hold that the Act grants foster parents a right to payments, enforceable through 42 U.S.C. § 1983.

———————

CALABRESI, *Circuit Judge*:

This case asks whether Spending Clause legislation that directs specific payments to identified beneficiaries creates a right enforceable through 42 U.S.C. § 1983. We hold that it does.

Congress enacted the Adoption Assistance and Child Welfare Act of 1980 ("the Act") "to strengthen the program of foster care assistance for needy and dependent children." Pub. L. 96-272, 94 Stat. 500 (1980). One of the ways the Act does so is by creating a foster care maintenance payment program. 42 U.S.C. § 671(a)(1). Under this program, participating states receive federal aid in exchange for making payments to foster parents "on behalf of each child who has

been removed from the home of a relative." *Id.* § 672(a)(1), (2). These payments are calculated to help foster parents provide their foster children with basic necessities like food, clothing, and shelter.

The particular question before us is whether the Act grants foster parents a right to these payments enforceable through a Section 1983 action. Three Courts of Appeals have reached this issue. The Sixth and Ninth Circuits have held that it does. *Cal. State Foster Parent Ass'n v. Wagner*, 624 F.3d 974 (9th Cir. 2010); *D.O. v. Glisson*, 847 F.3d 374 (6th Cir. 2017). The Eighth Circuit has held that it does not. *Midwest Foster Care and Adoption Ass'n v. Kincade*, 712 F.3d 1190 (8th Cir. 2013).

We join the Sixth and Ninth Circuits in holding that the Act creates a specific entitlement for foster parents to receive foster care maintenance payments, and that this entitlement is enforceable through a Section 1983 action. The district court, Kuntz *J.*, held to the contrary. Accordingly, we **VACATE** the order dismissing the case and **REMAND** for further proceedings.

**I.    Background**

This appeal arises from a Section 1983 action filed in federal district court by the New York State Citizens' Coalition for Children ("the Coalition"). The Coalition's suit, brought on behalf of its foster parent members, alleges that the

New York State Office of Children and Family Services ("the State") has failed to make adequate foster care maintenance payments as required by the Act.

The district court dismissed the Coalition's suit, holding that the Act creates no federally enforceable right to receive foster care maintenance payments. The Coalition appealed. On appeal, the State asserted, for the first time, that the Coalition lacked standing to bring this suit on behalf of its members. We remanded the case to the district court for additional factfinding on that issue. On remand, the district court found that the Coalition has standing: The Coalition must expend resources to advise and assist foster parents because of the State's allegedly inadequate reimbursement rates.

The Coalition then returned to this Court for review of the district court's original holding that they could not enforce the Act through Section 1983. The State, yet again, raised a new argument on appeal, this time that the Coalition lacks standing to bring this suit under the third-party standing rule.

Before considering the original issue before us—that is, whether the Act creates a federally enforceable right to receive foster care maintenance payments— we must address the State's claim that the Coalition lacks organizational and third-party standing to litigate these claims on behalf of its foster parent members.

**II.** **Standing**

To bring a Section 1983 suit on behalf of its members, an organization must clear two hurdles. First, it must show that the violation of its members' rights has caused the organization to suffer an injury independent of that suffered by its members. *Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011). Second, it must "demonstrat[e] a close relation to the injured third part[ies]," and "a hindrance" to those parties' "ability to protect [their] own interests." *Mid-Hudson Catskill Rural Migrant Ministry v. Fine Host Corp.*, 418 F.3d 168, 174 (2d Cir. 2005). We conclude that the Coalition has cleared both hurdles.

**A.** **Organizational Standing**

In a string of opinions, this Court has held that organizations suing under Section 1983 must, without relying on their members' injuries, assert that their own injuries are sufficient to satisfy Article III's standing requirements. *Nnebe*, 644 F.3d at 156-58; *League of Women Voters v. Nassau Cty.*, 737 F.2d 155, 160-61 (2d Cir. 1984); *Aguayo v. Richardson*, 473 F.2d 1090, 1099-1100 (2d Cir. 1973). To establish its own injury, an organization must show that it has suffered a "perceptible impairment" to its activities. *Nnebe*, 644 F.3d at 157. This showing can be met by

identifying "some perceptible opportunity cost" that the organization has incurred because of the violation of its members' rights. *Id.*

The Coalition asserts that the State's alleged violations of the Act has cost it hundreds of hours in the form of phone calls from aggrieved foster families. The district court found, and we agree, that the Coalition has spent nontrivial resources fielding these calls, and that it will continue to have to do so absent relief. This showing is sufficient to establish that the Coalition has suffered its own injury.

**B.     Third Party Standing**

When any plaintiff asserts the rights of others, it has traditionally also faced, in our court, a rule of prudential standing: the so-called third-party standing bar. With some exceptions, this rule prevents "litigants from asserting the rights or legal interests of others [simply] to obtain relief from injury to themselves." *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 40 (2d Cir. 2015) (quoting *Rajamin v. Deutsche Bank Nat. Trust Co.*, 757 F.3d 79, 86 (2d Cir. 2014)).

There is considerable uncertainty as to whether the third-party standing rule continues to apply following the Supreme Court's recent decision in *Lexmark v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014). In *Lexmark*, the Supreme Court cast doubt on the entire doctrine of prudential standing, explaining that a

court can no more "limit a cause of action that Congress has created" than it can "apply its independent policy judgment to recognize a cause of action that Congress has denied." *Id.*at 1388. Nevertheless, in *United States v. Suarez*, a post-*Lexmark* case, we continued to hold that courts are required to address third-party standing. 791 F.3d 363, 367 (2d Cir. 2015). In *Suarez*, however, we did not address *Lexmark*.

But we need not, in the case before us, resolve this tension. Whatever the status of the third-party standing bar, our cases have developed an exception to it where a plaintiff can show "(1) a close relationship to the injured party and (2) a barrier to the injured party's ability to assert its own interests." *Keepers, Inc.*, 807 F.3d at 41. That exception applies here.

It is evident that the Coalition enjoys a close relationship with the foster parents it counsels, not least because those foster parents have authorized the Coalition to file suit on their behalf. The State argues, however, that the Coalition has failed to show that it would be "difficult if not impossible" for the foster parents to protect their own rights. December 22, 2017 Appellee Letter Br. at 14. But the third-party standing rule does not demand anything near impossibility of suit. *See* 15 James William Moore, *Moore's Federal Practice* § 101.51[3][c][iii] (3d ed.

2008). Instead, a mere "practical disincentive to sue"—such as a desire for anonymity or the fear of reprisal—can suffice to overcome the third-party standing bar. *Id.*; *See also Keepers*, 807 F.3d at 42; *Comacho v. Brandon*, 317 F.3d 153, 160 (2d Cir. 2003).

And here, the Coalition has demonstrated that the manifest desire of their foster parent members for anonymity constitutes a significant disincentive for those parents to sue in their own names. It did so by submitting an anonymous affidavit from one of its members articulating two reasons the member desired anonymity. First, the member feared retaliation because a state agency had previously retaliated against them after they had lodged a complaint against it. Second, the parent also sought to protect their anonymity out of concern for their foster children's well-being:

> Even if the names of my children are filed under seal or redacted from public documents, disclosure of my name… puts my foster children's anonymity at risk… The children that have come from traumatic and often abusive environments. Any negative repercussions resulting from the public disclosure of the fact that they are all in foster care will only add to their history of trauma, and I want to protect my children from that.

D. Ct. Dkt. # 17-3 ¶¶ 10-11.  It is no stretch to believe that foster parents, who have opened their homes to children in need, would forgo financial benefits to protect those children.

We are thus satisfied that the Coalition is properly positioned to represent its members' rights effectively. And we are satisfied that those members are significantly impaired from pursuing those rights on their own. Accordingly, we conclude that the third-party standing rule does not bar the Coalition from pursuing its claims.

**III.     A Right to Foster Care Maintenance Payments Enforceable through Section 1983.**

Having found that the Coalition has standing, we turn to the main question in this case: Do foster parents have a right to foster care maintenance payments enforceable through a Section 1983 action? Section 1983 is a vehicle for individuals to enforce "any *right*[] . . . secured" by federal law. 42 U.S.C. § 1983 (emphasis added). Whether that vehicle is available to foster parents seeking to obtain foster care maintenance payments turns on whether (a) the Act means to confer on foster parents a right to those payments, in which case Section 1983 would be available. Or, whether the Act, instead, intends (b) simply to focus on the operations of the

regulated entity (the states), and is designed only to give states guidance in administering aid to foster parents; or (c) relies solely on the regulatory authority (the Secretary of Health and Human Services) to see to it that the Act's requirements are met, with the result that Section 1983 would be foreclosed.

Our review of the Act's text and statutory structure leads us to conclude that Congress did indeed create a specific monetary entitlement aimed at assisting foster parents in meeting the needs of each foster child under their care. What is more, we find that the Act's provision of (limited) federal agency review for a state's substantial compliance is insufficient to supplant enforcement through Section 1983. We therefore hold that the Coalition can bring a Section 1983 action on behalf of its foster parent members.

**A.      Statutory Background**

The Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. § 670 *et seq.*, is Spending Clause legislation directed at state administration of foster care and adoption assistance services. Relevant here, the Act creates a "Foster Care Maintenance Payments Program," the details of which must be recounted in some detail.

**1.** **State Plan Requirements.** To receive federal aid under the Act, states must submit a plan for approval to the Secretary of Health and Human Services (the Secretary). Section 671 details what a state plan must provide to qualify. Section 671's requirements are numerous and far-ranging; they run from dictating how information about individuals involved in the foster care system may be disclosed, *Id.* § 671(a)(8), to providing guidelines on how and when a state should give priority to reuniting families, *Id.* § 671(a)(15). Significantly, one of Section 671's thirty-five requirements is that the state plan provide for foster care maintenance payments. *Id.* § 671(a)(1).

**2.** **Foster Care Maintenance Payments**. Once a state plan has been approved, Section 672, titled "Foster care maintenance payments programs," directs participating states—that is, states with an approved plan—to make maintenance payments to foster parents on behalf of each foster child under their care. Section 675 then defines the costs that compose those payments.

The mandate appears in Subsection 672(a)(1). This subsection, titled "Eligibility," has two components. The first provides that "[e]ach State with a plan approved under this part shall make foster care maintenance payments on behalf of each child . . . ." *Id.* § 672(a)(1). The second addresses which foster children are

eligible for foster care maintenance payments to be made on their behalf. *Id.* § 672(a)(1)(A),(B) (incorporating Section 672(a)(2),(3)). Eligibility is dictated by the financial resources of the child, how the child was removed from the home, who is responsible for the child, and where the child is placed. *Id.* § 672(a)(2),(3).

Subsection 672(b) provides that the state can make these payments either to the child's foster parent, to the institution where the child is placed, or to a local agency.

Section 675 then defines what exactly constitutes a "foster care maintenance payment":

> [T]he term "foster care maintenance payments" means payments to cover the cost of (and the cost of providing) food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance with respect to a child, reasonable travel to the child's home for visitation, and reasonable travel for the child to remain in the school in which the child is enrolled at the time of placement.

Section 675(4) further states that these payments "shall include," for institutional placements, the reasonable costs of operating the institution, and "shall also include" the costs of caring for the offspring of any foster children if the foster

child and his or her children are in the same placement. In defining foster care maintenance payments, the Act exclusively uses mandatory language.[1]

**3.** **Federal Reimbursement.** Section 674 details when a state is entitled to reimbursement from the Federal Government. Briefly put, states are entitled to reimbursement of a percentage of payments made under Section 672, as well as other costs including training and information systems expenditures. *Id.* § 674(a)(1),(3).

**4.** **Review and Enforcement Mechanisms**. The Act creates three avenues for review of a state's compliance with its obligations under the Act: two through the state and one through the Secretary.

Both avenues for state review are dictated by Section 671, the section governing the requirements the state must meet to qualify for the program. First, Section 671 requires the state to conduct "periodic review of the . . .amounts paid as foster care maintenance payments . . .to assure their continuing appropriateness." *Id.* § 671(a)(11). The second avenue of state review is addressed to recipients of benefits under the Act. Section 671 requires the state to provide "an

---

[1] Since children remain in foster care until they are eighteen, it occasionally occurs that a foster child has children.

13

opportunity for a fair hearing before the State agency to any individual whose claim for benefits available pursuant to this part is denied or is not acted upon with reasonable promptness." *Id.* § 671(a)(12).

The third avenue for review, found in Section 1320a-2a, is the only avenue for federal review expressly provided for in the Act. Section 1320a-2a directs the Secretary to create regulations to ensure states' "substantial conformity" with the dictates of federal law and the state's own plan. *Id.* § 1320a-2a(a). If a state fails to conform substantially, then the Secretary may withhold funds "to the extent of the [state's] failure to so conform." *Id.* § 1320a-2a(b)(3)(C).

The State has not pointed us to any mechanism for the Act's beneficiaries to obtain federal review of their claims. Thus, the only mechanism of federal control over state behavior is the cutting off of funds. Nor has the State pointed us to any claim-processing requirements—e.g., no burdens of proof, exhaustion requirements, or limitation of remedies—that allowing a Section 1983 action would upset.

* * *

In sum, the Act requires a state to submit a plan to the Secretary for approval. Once the Secretary approves the state's plan, the Act directs the state to

14

make payments to foster parents on behalf of each eligible child to cover costs such as food, clothing, and school supplies. The Federal Government then reimburses the state for a percentage of those payments so long as it remains in "substantial compliance" with its own plan, the regulations of the Secretary, and the requirements of the Act. While the Act requires states to conduct internal review and contemplates that the Secretary will ensure that the state remains in substantial compliance, the only individual review mechanism specifically provided for in the Act is at the state level.

**B. The Presumption**

The Supreme Court, in *Blessing v. Freestone*, 520 U.S. 329 (1997), articulated a three-factor test for determining whether a statute creates a right enforceable through Section 1983. First, "Congress must have intended that the provision in question benefit the plaintiff." *Id*. at 340. In *Gonzaga University v. Doe*, 536 U.S. 273, 283 (2002), the Court clarified that this factor requires more than a showing that the "plaintiff falls within the general zone of interest that the statute is intended to protect." The statute must confer a right on the plaintiff as shown by use of rights-creating language—that is, language that demonstrates a statutory focus on the needs of the individual, rather than the operations of the regulated entity. *Id*. at

287-88. Second, the plaintiff must "demonstrate that the right assertedly protected by the statute is not so vague and amorphous that its enforcement would strain judicial competence." *Blessing*, 520 U.S. at 340-41 (internal quotation marks omitted). And, third, the "statute must unambiguously impose a binding obligation on the States." *Id.* at 341.

If a statute grants a right to a plaintiff class, the right is fit for judicial enforcement, and the state is obligated to fulfill the right, then a rebuttable presumption attaches that a Section 1983 action enforcing the right is available. *Id.*; *Gonzaga*, 536 U.S. at 284 & n. 4. A state defendant can overcome this presumption, however, by showing that Congress intended to foreclose a remedy under Section 1983, either expressly "or impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement." *Blessing*, 520 U.S. at 3441.

The dissent attempts to cast doubt on whether *Blessing*'s three-factor test remains good law after *Gonzaga*. [Dissent at 20-21] *Gonzaga*, however, did not overrule *Blessing*; rather, it clarified the rule in *Blessing* by correcting a misinterpretation of that rule that had been adopted by some lower courts. *See Gonzaga*, 536 U.S. at 282-83. To the extent that the dissent is trying to read the tea

leaves to predict that the Supreme Court may move away from *Blessing* in the future, this Court is not tasked with—and is, in fact, prohibited from—such guesswork. We are bound to follow the existing precedent of the Supreme Court until that Court tells us otherwise. *See Agostini v. Felton*, 521 U.S. 203, 238 (1997); *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989). Thus, we apply the *Blessing* test with the principles enunciated in *Gonzaga* firmly in mind. *See Briggs v. Bremby*, 792 F.3d 239, 242-45 (2d Cir. 2015) (applying *Blessing*'s three-factor test after, and in light of, *Gonzaga*).

1.      **Binding Obligation.** Since the State argues that the Act's regulation of foster care maintenance payments is permissive and not mandatory, we first consider whether the Act imposes a binding obligation on participating states. In the State's view, the Act merely details what expenses *may* be included in the payments (*i.e.* will be reimbursed by the Federal Government), not what expenses *must* be included.

This construction is belied by the Act's text. As we pointed out earlier, the Act does not use permissive language—either in creating the obligation for the state to make payments to foster parents, or in defining what expenses those payments must account for. The Act, instead, uses clearly mandatory language—

"shall"—binding states to make these payments. *Id.* § 672(a). The Act then defines, with particularity and in absolute terms, what expenses constitute those payments. *See Id.* § 675(4) ("foster care maintenance payments means," "shall include," "shall also include"). Significantly, the State points to no statutory text in support of its position that the expenses listed in the definition of foster care maintenance payments are optional, rather than mandatory.

Undaunted, the State argues that the title of Section 672(a), "Eligibility," demonstrates that Section 672 is intended to outline only which portions of the foster care maintenance payments made by a state are eligible for federal reimbursement. But the State plainly misreads Section 672(a). Its title is a reference to which *foster children* are eligible to have maintenance payments made on their behalf, not which *payments by a state* are eligible for federal reimbursement.

The overall statutory structure confirms the untenability of the State's reading. Where Congress limited which *state payments* are eligible for federal reimbursement, it did so explicitly. So in Subsections 672(d) and (e), which are addressed to children who have been removed from the home pursuant to a voluntary placement agreement, the Act clearly states that "Federal payments may" (or may not) be made. And it is not Section 672, but another section

entirely—Section 674, titled "Payment to States"— that delineates the specifics of a state's entitlement to reimbursement from the Federal Government.[2] In effect, Congress has offered the states a reasonable bargain: pay for the expenses that we deem essential and we will partially reimburse you for them.

**2.    Conferral of Rights.** Having determined that the Act creates an obligation for participating states to make payments covering the costs detailed in Section 675(4), the question remains whether that obligation is also an enforceable right vested in foster parents.[3]

As mentioned earlier, a statute must "manifest[]" Congress's "'unambiguous' intent to confer individual rights" in order to support a Section 1983 action.  *Gonzaga*, 536 U.S. at 280 (quoting *Pennhurst State Sch. & Hosp. v.*

---

[2] To support its position that the statutory text is permissive, the State relies in part on a piece of informal guidance from the Department of Health and Human Services, which refers to the expenses listed in § 675(4) as "allowable expenses."  U.S. Dep't of Health & Human Servs., *Child Welfare Policy Manual*, http://perma.cc/2KYA-SHTT. The Child Welfare Policy Manual, however, is not a product of notice and comment rulemaking and is not entitled to *Chevron* deference. *See United States v. Mead*, 533 U.S. 218 (2001). The State also points to 45 C.F.R. § 1355.20(a). This regulation, which is a product of notice and comment rulemaking, in relevant part states only, "Local travel associated with providing the items listed is also an allowable expense." 45 C.F.R. § 1355.20(a). It is unlikely that the agency, in this one sentence, purported to resolve the issue of whether states are required to make foster care maintenance payments that cover the costs detailed in Section 675(4). Indeed, it would be a strange and oblique way of answering so central a question.

[3] For the reasons discussed in Part I, the Coalition is an appropriate representative of the plaintiff class of foster parents.

*Halderman*, 451 U.S. 1, 17 (1981)). To discern Congress's intent, the Supreme Court has directed us to look to whether a statute focuses on the needs of the individual, as opposed to the operations of the regulated entity. *E.g.*, *id.* at 287-88.

Such an inquiry has led the High Court to hold that statutory provisions with a programmatic focus do not create enforceable rights. In *Gonzaga*, a student plaintiff sought to enforce a provision of the Family Educational Rights and Privacy Act of 1974. The provision the student plaintiff relied on read:

> No funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of permitting the release of education records (or personally identifiable information contained therein . . .) of students without the written consent of their parents to any individual, agency, or organization.

*Gonzaga*, 526 U.S. at 279 (quoting 20 U.S.C. § 1232g(b)(1)). The Supreme Court held that this provision of FERPA, directed as it is to the "policy or practice" of educational institutions, evinced that Congress lacked the intent to create a right in individuals that would be enforceable through Section 1983.

Similarly, in *Blessing*, custodial parents sought to enforce Title IV-D of the Social Security Act, 42 U.S.C. §§ 651-669b (1994), which directs participating states to operate an enforcement program for child support payments. The plaintiffs in

*Blessing* sought to enforce the state's substantial compliance with the entire statutory regime, including provisions aimed at managing bureaucratic matters like staffing and data processing. 520 U.S. at 337, 344-45. While holding open the possibility that some provisions of Title IV-D might create enforceable rights, the Supreme Court rejected the plaintiffs' efforts to rectify "the State's systemic failures." *Id.* at 344-45. As the Court explained, "[f]ar from creating an *individual* entitlement to services, the [substantial compliance] standard is simply a yardstick for the Secretary to measure the *systemwide* performance of" the state. *Blessing*, 520 U.S. at 343.

In contrast, "[t]he Supreme Court has repeatedly recognized that a federal statute [that] explicitly confers a specific monetary entitlement on an identified beneficiary" *does* create an enforceable right. *Cal. State Foster Parent Ass'n*, 624 F.3d at 978. Thus, in *Wright v. City of Roanoke Redevelopment and Housing Authority*, 479 U.S. 418 (1987) and *Wilder v. Virginia Hospital Association*, 496 U.S. 498 (1990), the Supreme Court found that the Federal Housing Act and the Medicaid Act created enforceable rights because they bestowed on the plaintiff class a "mandatory

benefit focus[ed] on the individual" and a "specific monetary entitlement," respectively.[4] *Gonzaga*, 536 U.S. at 280.

Section 672(a) and (b) of the Child Welfare Act grants precisely such a specific entitlement to an identified class of beneficiaries. The Act is aimed directly at the needs of individual foster children, and, to meet those needs, it grants a monetary entitlement to those children's foster parents.

First, Section 672(a) is focused on the needs of individual foster children. The Act's use of the term "each child" indicates an individual focus. 42 U.S.C. § 672(a) (Participating states "shall make foster care maintenance payments on behalf of *each* child . . . ." (emphasis added)). "Each" is "used to refer to every one of two or more people or things, *regarded and identified separately*." Oxford English Dictionary, "each," (Online ed., Accessed May 16, 2018) (emphasis added). By referencing "each child"—rather than, for example, stating the state must establish

---

[4] The dissent gloms on to one sentence of dicta in a footnote in *Armstrong v. Exceptional Child Center*, — U.S. —, 135 S. Ct. 1378, 1386 n.*, to suggest that *Wright* and *Wilder* are no longer good law. [Dissent at 34] But this Circuit has continued to follow *Wright* and *Wilder* even after *Armstrong*. *See, e.g.*, *Briggs*, 792 F.3d at 242-45. And this panel does not have the authority to overrule *Briggs*, nor does this Court have the authority to fail to follow *Wilder* and *Wright* where the Supreme Court has not overruled them. *See supra* text at 16-17.

The dissent attempts to avoid *Briggs* by noting that it did not address *Armstrong*. Indeed, *Briggs* did not address *Armstrong*—but there is no reason to view this as an oversight rather than as an indication that the panel in *Briggs* did not consider *Armstrong* to govern the facts before it. We, likewise, do not consider *Armstrong* to be controlling on the facts now before us. *See infra* text at 30-31.

a maintenance payment program to meet the needs of foster children—Congress expressed its concern with "the needs of . . . particular person[s]," not "aggregate services."

The definition of "foster care maintenance payments" in Section 675(4) buttresses this reading of Section 672(a). These payments relate to basic life essentials: food, clothing, shelter. Congress, in employing this definition of foster care maintenance payments, again demonstrates a concern with individual need in its most basic sense.

Second, the Act designates foster parents as the intended recipients of the payments. Section 672(a) states that payments are made "on behalf of" each foster child and Subsection (b) nominates foster parents as one of three proper recipients of the payments. Thus, the Act, which is directly concerned with the needs of foster children, *id.* § 672(a), designates foster parents as the holders of the right, *id.* § 672(b). This statutory design is fully understandable: foster parents are the ones who incur the costs of caring for foster children. If the Act intends to ensure that foster children's basic needs are provided for, it makes sense for Congress to vest the right to defined payments in those who do the providing.

This case is therefore much closer to *Wilder* and *Wright*, where the Supreme Court found an enforceable right, than it is to *Gonzaga* and *Blessing*, where it did not. As in *Wilder* and *Wright*, the Act "unambiguously confer[s]" a "mandatory benefit," or "entitlement," to a discernible group of rights holders. *See Gonzaga*, 536 U.S. at 280. And in contrast to *Gonzaga* and *Blessing*, that entitlement is "specific and definite" and "focus[ed] on the individual." *Id.* Accordingly, we conclude that Section 672(a), read in conjunction with Subsection (b) and Section 675(4), creates a right to payments enforceable by foster parents.[5]

**3.** **Fit for Judicial Enforcement.** Even if a statute seems to vest rights in plaintiffs, those rights must be fit for judicial enforcement for a Section 1983 suit

---

[5] The State, relying on passing language in *Gonzaga*, seems to suggest that the presence of substantial conformity review, instead of individualized review, shows that the Act does not grant a right in the first place. In *Gonzaga*, the Court reflected on the fact that "Congress did not contemplate terminating funding on the basis of one violation of the privacy standards, but only where an institution had broader policies and practices that violated FERPA" to confirm its view that the statute, as a whole, was oriented only towards institutional policy. *Cal. State*, 624 F.3d at 980. The presence of substantial conformity review, which only garnered passing mention in *Gonzaga*, merely reinforced the absence of individually focused language. And it was actually the presence of individual federal review that drew the Court's focus. *See Gonzaga*, 536 U.S. at 289 ("Our conclusion that FERPA's nondisclosure provisions fail to confer enforceable rights is buttressed by the mechanism that Congress chose to provide for enforcing those provisions.").

In any event, the State's suggestion proves too much. Under the State's reasoning, a plaintiff would be damned if the statute provides its own individual remedy, and damned if the statute does not. The only time Section 1983 would not be supplanted as a remedy would be when a statute provides for neither individual review, nor substantial compliance review. We decline to narrow the scope of the Section 1983 remedy so dramatically. We therefore limit the consideration of the agency review mechanism to the State's case for rebutting the presumption.

to lie. In other words, the right cannot be "so vague and amorphous that its enforcement would strain judicial competence." *Blessing*, 520 U.S. at 340-41.

The provisions of the Act requiring states to make foster care maintenance payments are fit for judicial enforcement. Section 672(a), read with Sections 672(b) and 675(4), creates a right to payments that cover certain expenses like food, shelter, and school supplies. In enforcing foster parents' right to sue for such payments, courts would, therefore, be required to review how a state had determined the amounts it pays, including how it has quantified the costs of the specific expenses listed in Section 675(4). This review falls comfortably within what courts regularly do: it requires primarily fact-finding and only very limited review of policy determinations.

The Child Welfare Act does give states some discretion as to how to calculate costs and to distribute payments. And courts may well defer to reasonable exercises of that discretion. *See Wagner*, 624 F.3d at 981 (holding that the court may "give deference to a reasonable methodology employed by the State" for calculating costs, and that, even with such deference, "the absence of a uniform federal methodology for setting rates 'does not render the [statute] unenforceable by a court" (quoting *Wilder*, 496 U.S. at 519)). Significantly, the

State's discretion under the Act is considerably more cabined than that afforded states under the Medicaid Act in *Wilder* and the Federal Housing Act in *Wright*, both cases where the Supreme Court found that the asserted rights were enforceable.

The provision of the Medicaid Act at issue in *Wilder* required states to set rates that were "reasonable and adequate" to reimburse "efficiently and economically operated" health care facilities. 496 U.S. at 503 (quoting 42 U.S.C. § 1396a(a)(13)(A) (1982)). To determine whether a given rate satisfied these requirements, the statute set forth certain factors for consideration, such as "the unique situation (financial and otherwise) of a hospital that serves a disproportionate number of low income patients." *Id.* at 519 n. 17. The Supreme Court found that this provision provided sufficient guidance to be fit for judicial enforcement. In fact, the Supreme Court noted that the Medicaid Act "provide[d], if anything, more guidance than the provision at issue in *Wright*, which vested in the housing authority substantial discretion for setting utility allowances." *Id.*

If rate-settings that require a state to determine what is reasonable, adequate, efficient, and economical are fit for judicial review, then rate-setting that merely requires a state to quantify costs for set expenses must also be. Accordingly,

we find that foster parents' right to receive foster care maintenance payments is fit for judicial enforcement.

* * *

In sum, applying the *Blessing* factors to this case, we conclude that the Act meets the requirements to create a presumption that foster parents have a right to foster care maintenance payments that cover the enumerated expenses that is enforceable through Section 1983.[6]

**C.     The Rebuttal**

But even when a statute grants such a right to a plaintiff class, resort to Section 1983 is barred when the statute provides "remedial mechanisms . . . sufficiently comprehensive and effective to raise a clear inference that Congress intended to foreclose a [Section] 1983 cause of action." *See Wright*, 479 U.S. at 425. The State argues that the Act, by directing the Secretary to review the state's

---

[6] "Plaintiffs suing under [Section] 1983 do not have the burden of showing an intent to create a private remedy because [Section] 1983 generally supplies a remedy for the vindication of rights secured by federal statutes." *Gonzaga*, 536 U.S. at 284. Hence, we start with the presumption that foster parents may bring a Section 1983 action. *See Blessing*, 520 U.S. at 340-41.

actions for substantial conformity with the Act's commands, forecloses Section 1983 remedies.[7]

The State is mistaken. The Supreme Court has often rejected arguments that a statute's remedial scheme forecloses a Section 1983 action. *Blessing*, 520 U.S. at 346-48; *Wilder*, 496 U.S. at 428-29; *Wright*, 479 U.S. at 428-29; *Cannon v. Univ. of Chicago*, 441 U.S. 677, 704-07 (1979); *see also Briggs*, 792 F.3d at 245. Indeed, the Supreme Court has generally found a remedial scheme sufficiently comprehensive to supplant Section 1983 only where it "culminate[s] in a right to judicial review" in federal court. *Wilder*, 496 U.S. at 521 (describing *Smith v. Robinson*, 468 U.S. 992, 1010-1011 (1984) and *Middlesex Cty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 13 (1981)). Time and again, the Supreme Court has stressed the importance that some avenue for federal review exist to hear the claims of "aggrieved

---

[7] The State also argues that a Section 1983 action is not a proper remedy because the Act is Spending Clause legislation. It is true that the "typical remedy" for "state noncompliance" with Spending Clause legislation is federal action to terminate funds to the state, rather than private causes of action, *Pennhurst*, 451 U.S. at 28. But the fact that a law is based on the Spending Clause is by no means determinative. Thus, in *Maine v. Thiboutot*, 448 U.S. 1 (1980), *Wright,* and *Wilder*, the Supreme Court found that Spending Clause legislation supported a cause of action under Section 1983. And, with respect to the entire Social Security Act, including this Child Welfare Act, Congress explicitly anticipated the possibility of Section 1983 actions. Thus, Congress amended the Act to override the reasoning in *Suter v. Artist M.,* 503 U.S. 347 (1992), and thereby to enable appropriate provisions of the Social Security Act to give rise to a private enforcement action (*Suter* would have foreclosed a private enforcement action under any section governing state plan requirements). *See* 42 U.S.C. § 1320a-2. It would have been pointless for Congress to do this if it did not contemplate that some provisions of the Act would support a private enforcement action.

individuals." *See Gonzaga*, 536 U.S. at 289-90; *Blessing*, 520 U.S. at 348; *Wilder*, 496 U.S. at 521-22; *Wright*, 479 U.S. at 428; *see also City of Rancho Palos Verdes, Cal. v. Abrams*, 544 U.S. 113, 121 (2005) ("[T]he existence of a more restrictive private remedy for statutory violations has been the dividing line between those cases in which [the Court has] held that an action would lie under [Section] 1983 and those in which [the Court has] held that it would not.").

No such avenue exists here. The Act provides no federal court review of an individual's claim, other than what, under *Blessing*, is presumptively available under Section 1983.[8] Nor is there federal agency review for claims by an aggrieved individual. The only federal review provided under the Act is review by the Secretary for substantial conformity with the Act and with the state's approved plan, with the possibility of funding cutoffs as the sole remedy.

The Supreme Court has made clear that a federal agency's "generalized powers are insufficient to indicate a congressional intent to foreclose [Section] 1983 remedies." *Wright*, 479 U.S. at 428. And, in *Blessing*, the High Court explicitly

---

[8] There is also no avenue for state court review The Act provides only for state agency proceedings for aggrieved individuals. Yet, confoundingly, the State argues that this state agency review is sufficient to foreclose resort to Section 1983. State review, standing alone, has never been deemed sufficient to supplant a Section 1983 action. *See Blessing*, 520 U.S. at 348; *Wilder*, 496 U.S. at 522-23; *Wright*, 479 U.S. at 427-28. And we will not deviate from that course here.

rejected the notion that substantial compliance review, coupled with funding cut-offs, is sufficient to supplant a private right of action under Section 1983. 520 U.S. at 348; *see also Wright*, 479 U.S. at 428. Accordingly, we reject the state's contention that the substantial conformity review provided for in the Act supplants the Section 1983 remedy. *See Briggs*, 792 F.3d at 239.

This outcome is wholly consistent with the Supreme Court's precedent in *Armstrong v. Exceptional Child Center, Inc.*, — U.S. —, 135 S. Ct. 1378 (2015). The dissent accuses us of ignoring *Armstrong*, which, it claims, "squarely controls our case." Dissent at 30-32. In fact, *Armstrong* is readily distinguishable on multiple grounds. First, *Armstrong* addressed the question of whether the plaintiffs had a cause of action *in equity* to enforce Section 30(A) of the Medicaid Act. *Id.* at 1385. *Armstrong* did not consider whether the plaintiffs would have had a private cause of action under Section 1983. *See id.* at 1392 (Sotomayor, J., dissenting) (distinguishing actions in equity from Section 1983 suits). The dissent, going beyond the holding in *Armstrong*, argues that, "if [the plaintiffs] could not enforce the provision in equity, *a fortiori*, they could not do so pursuant to a § 1983 theory." Dissent at 33. This reasoning is fundamentally flawed. It belittles the purpose of the Civil Rights Act of 1871, which established Section 1983 claims precisely to

permit plaintiffs to sue the government for civil rights violations where they might not otherwise have had a remedy. To limit Section 1983 claims only to instances where plaintiffs would have a claim in equity would be totally inconsistent with the purposes of Section 1983.

Second, the court in *Armstrong*, in denying the existence of a cause of action in equity as to the statute before it, relied on "[t]he sheer complexity associated with enforcing § 30(A), coupled with the express provision of an administrative remedy." *Armstrong*, 135 S. Ct. at 1385. Indeed, *Armstrong* specifically states that "[t]he provision for the Secretary's enforcement by withholding funds might not, *by itself*, preclude the availability of equitable relief. But it does so when combined with the judicially unadministrable nature of § 30(A)'s text." *Id.* For the reasons discussed above in Section III.B.3, the provisions of the Child Welfare Act requiring states to make foster care maintenance payments are not judicially unadministrable. Therefore, *Armstrong* is in no way inconsistent with our holding that a cause of action under Section 1983 exists here.

\* \* \* \* \*

The Act uses mandatory language, binding participating states. It evinces a Congressional focus on meeting the needs of individual foster children and

31

translates that focus into a specific monetary entitlement granted to an identified class of beneficiaries: foster parents. The Act, moreover, provides sufficient guidance to courts to make the right appropriate for judicial enforcement. Since the Act does not provide any other federal avenues for foster parents to vindicate that right, the right is enforceable through Section 1983. Accordingly, we **VACATE** the order of the district court and **REMAND** for further proceedings.

DEBRA ANN LIVINGSTON, *Circuit Judge*, dissenting:

The Child Welfare Act of 1980 ("the CWA" or "the Act"), provides a mechanism for partial federal reimbursement of a subcategory of state expenditures on foster care. *See* 42 U.S.C. § 670. Today, the majority concludes that this partial federal support system imposes a categorical foster care *spending requirement* on all recipient states, regardless of the limits their respective legislatures may have placed on such expenditures. Not content to stop there, the majority then holds that the CWA provides some (though not all) foster parents with a privately enforceable *right* under 42 U.S.C. § 1983 to receive some uncertain sum of money from the state.

I disagree on both counts. This Court may not recognize a right enforceable under § 1983 unless Congress has "manifest[ed] an 'unambiguous' intent to confer" such a right. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 280 (2002) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). The CWA does not "unambiguously" require states to cover the entire cost of a category of foster care expenditures; still less do the relevant provisions of the CWA meet our demanding standard for creating a privately enforceable right to those payments under § 1983.

"[T]he National Government, anxious though it may be to vindicate and protect federal rights . . . , always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States." *Levin v. Commerce Energy, Inc.*, 560 U.S. 413, 431 (2010) (quoting *Younger v. Harris*, 401 U.S. 37, 44 (1971)). The majority's decision today violates this principle, upending the relationship between the federal government and state foster care systems while ushering dozens of federal judges in this Circuit into the delicate and sensitive world of local child-welfare policymaking. I see nothing in the CWA indicating that Congress intended such a result—let alone that it *unambiguously* did so. I therefore respectfully dissent.

## I

### A

In 1980, Congress enacted the CWA, also known as Title IV-E of the Social Security Act, to assist states in providing foster care in appropriate circumstances and for appropriate periods by offering "fiscal incentives to encourage a more active and systematic monitoring of children in the foster care system." *Vermont Dep't of Soc. & Rehab. Servs. v. U.S. Dep't of Health & Human Servs.*, 798 F.2d 57, 59 (2d Cir. 1986). Passed pursuant to Congress's Spending Clause power, *see Suter v.*

*Artist M.*, 503 U.S. 347, 355–56 (1992), the CWA establishes a partial reimbursement mechanism for *some* of the expenses that states incur as to *some* of the children in their foster care and adoption-services programs. But these specified expenses, incurred within the CWA's statutory constraints, are eligible for partial reimbursement only if a state has chosen to participate in the federal program, enacted a plan of operation for its foster care system, and received approval for that plan from the Secretary of Health and Human Services ("HHS"). 42 U.S.C. § 671(a).

As relevant here, the CWA provides for partial reimbursement of "foster care maintenance payments" and requires each state plan to "provide for [such] payments in accordance with section 672" of the Act. 42 U.S.C. § 671. Section 672(a)(1), entitled "Eligibility," dictates that states with approved plans "shall make foster care maintenance payments on behalf of each child who has been removed from the home of a relative," so long as (1) removal and foster care placement requirements have been met and (2) the child "would have otherwise qualified for assistance under the now-defunct Aid to Families with Dependent Children program."[1] *Midwest Foster Care and Adoption Ass'n v. Kincade*, 712 F.3d

---

[1] In other words, the statute provides for partial federal reimbursement of state support payments for only a percentage of the foster children in a state's foster care system. This

3

1190, 1194 (8th Cir. 2013) (discussing 42 U.S.C. § 672(a)(1)). Section 675 of the Act, entitled "Definitions," defines "foster care maintenance payments" as:

> payments to cover the cost of (and the cost of providing) food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance with respect to a child, reasonable travel to the child's home for visitation, and reasonable travel for the child to remain in the school in which the child is enrolled at the time of placement. In the case of institutional care, such term shall include the reasonable costs of administration and operation of such institution as are necessarily required to provide the items described in the preceding sentence.

*Id.* § 675(4)(A). States are eligible for federal reimbursement of their foster care maintenance payments up to "an amount equal to the Federal medical assistance percentage" for children in foster family homes or child-care institutions. *Id.* § 674(a)(1).

The Act, in pertinent part, provides for two review mechanisms to ensure state compliance with its provisions. The first requires HHS to issue regulations to monitor participating states' "substantial conformity" with the Act's requirements. *Id.* § 1320a-2a(a). HHS's regulations must, among other things:

- "specify the timetable for conformity reviews of State programs";

---

percentage of eligible children has declined over time, according to Defendant-Appellee New York, because "Congress has not raised financial eligibility standards since 1996." Br. Def-Appellee at 25.

4

- "specify . . . the criteria to be used . . . to determine whether there is a substantial failure to so conform"; and

- afford a noncomplying State the "opportunity to adopt and implement a corrective action plan."

*Id.* §§ 1320a-2a(b)(1), (b)(2), (b)(4)(A).  HHS may withhold funds "to the extent of [a state's] failure to . . . conform," *id.* § 1320a-2a(b)(3)(C), but it must allow noncompliant states to appeal such determinations to the HHS Departmental Appeals Board, and eventually to the federal courts, in "the judicial district in which the principal or headquarters office of the agency responsible for administering the program is located."[2]  *Id.* § 1320a-2a(c)(3).

The second review mechanism is more particular to the foster care maintenance payments at issue here.  The CWA requires states both to periodically review these payments "to assure their continuing appropriateness" and to provide an opportunity for caregivers whose claims for payments have been

---

[2] Pursuant to this review mechanism, we reviewed (and upheld) HHS's determination in 2003 that New York was *not* in substantial conformity because of the number of children in foster care who had not received necessary judicial determinations that the state had made reasonable efforts to finalize so-called "permanency plans" on their behalf.  *New York ex rel. N.Y. State Office of Children & Family Servs.*, 556 F.3d 90, 92 (2d Cir. 2009).  In 2012, however, the most recent review noted in the record here, HHS conducted a "primary" analysis of 80 randomly selected cases to assess whether New York was in "substantial conformity" with the law.  All 80 selected cases met eligibility requirements. New York State Title IV-E Foster Care Eligibility Review, Primary Review 2012, http://perma.cc/7GTP-PX5A.

denied to receive "a fair hearing before the [relevant] State agency." *Id.* §§ 671(a)(11), (a)(12). In New York, the state agency's decision is thereafter subject to further review through the state's robust procedures for review of administrative action.

The majority ends its brief discussion of the statute with a summary of these statutorily imposed review mechanisms. In doing so, it ignores the complex state and local foster care systems that predate the CWA. As New York reminds us, CWA funding "covers only a portion of the State's expenses, and New York's foster care program serves a broader range of children and spends money on a broader range of items and services than the federal statute covers." Br. Def-Appellee at 11–12. Before the CWA's passage, states decided the reimbursement rate for foster care providers, and payment rates varied widely. Such variance continues today, and unsurprisingly so, given that the CWA did not displace preexisting foster care systems but merely created a mechanism for partial reimbursement of a specified set of expenses associated with some children. *See* Kerry DeVooght et al., *Family Foster Care Reimbursement Rates in the U.S.*, tbl. 1 at 9–18 (2013), http://perma.cc/HY82-Q3AF.

New York's complex foster care program is largely administered at the local level. County social services departments are responsible for making payments to foster care providers in the first instance. These county departments, in turn, are reimbursed by New York's Office of Children and Family Services ("OCFS") up to certain maximum amounts. N.Y. Soc. Serv. L. § 153-k (1). A portion (but only a portion) of the funds paid by OCFS to the county departments are federal funds disbursed to the state pursuant to the CWA. *Id*. Counties are free to set their own reimbursement rates for foster parents, but the state will reimburse the counties only up to the maximum amount established at the state level. *Id.* at § 2(b).

In sum, the CWA represents a federal effort to incentivize state provision of adequate foster care arrangements. In doing so, the CWA provides important financial support to states, but this support extends to only a *portion* of large and complex state and local foster care systems, which themselves involve a complicated interplay between local demands and state funding. As for New York's foster care plan, it has been approved by the Secretary since 1982, and HHS has routinely found New York to be in compliance with the CWA.

**B**

Only with this background in mind does the full import of the majority's decision become clear. The majority first decides, in effect, that New York may well have been operating in rank violation of the CWA for over 35 years. (Inexplicably, no one seems to have noticed until now.) According to the majority, the partial federal reimbursement scheme enshrined in the CWA imposes a minimum foster care *spending obligation* on recipient states, which must cover the cost of a litany of specific items dictated by the federal government. This supposed spending obligation arises (again, according to the majority) because the Act employs "mandatory language" in § 672(a), which provides that participating states "shall make foster care maintenance payments," and then defines "in absolute terms" in § 675(4)(A) the expenses that constitute these mandatory "payments."[3] Maj. Op. at 18. New York argues, to the contrary, that § 672(a)

---

[3] By way of reminder, Section 675, the "Definitions" section of the CWA, defines foster care maintenance payments as:

> payments to cover the cost of (and the cost of providing) food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance with respect to a child, reasonable travel to the child's home for visitation, and reasonable travel for the child to remain in the school in which the child is enrolled at the time of placement. In the case of institutional care, such term shall include the reasonable costs of administration and operation of such institution as are necessarily required to provide the items described in the preceding sentence.

specifies the *conditions* under which states can receive federal reimbursement and that § 675(4)(A)'s definition of "foster care maintenance payments" simply "provide[s] an *allowable* list of items" for this reimbursement. Br. Def-Appellee at 26. But the majority rejects New York's argument and decides that any state whose payment rates fall short of covering the total "cost of (and the cost of providing)" all the items listed in § 675(4)(A) runs afoul of the statutory prerequisites for compliance with the CWA.

Respectfully, I disagree. I join the Eighth Circuit in concluding that §§ 672(a) and 675(4)(A) "speak to the states as regulated participants in the CWA and enumerate limitations on when the states' expenditures will be matched with federal dollars." *Midwest Foster Care*, 712 F.3d at 1197. So construed, § 675(4)(A) does not entitle foster parents and eligible institutions to a certain monetary sum; instead, it specifies those state expenditures that are "eligible for partial federal reimbursement."[4] *Id.; see also* Emilie Stoltzfus, Cong. Research Serv., R42792, *Child*

---

[4] As highlighted below, my interpretation of the CWA, unlike the majority's, is consistent with that of HHS (which has not appeared in this litigation). To take one example, in 2008, Congress amended § 675(4)(A) to broaden the definition of "foster care maintenance payments" to include "payments to cover the cost of (and the cost of providing) . . . reasonable travel for the child to remain in the school in which the child is enrolled at the time of placement." But HHS did not interpret this amendment as *requiring* states (as the majority would have it) to pay for such travel: "As with any cost enumerated in the definition of foster care maintenance payments in [§ 675(4)]," it said, "the [state] agency

9

*Welfare: A Detailed Overview of Program Eligibility and Funding for Foster Care, Adoption Assistance, and Kinship Guardianship Assistance Under Title IV-E of the Social Security Act* 17 (2012) ("[T]here is no federal minimum or maximum foster care payment rate. States are permitted to set these rates and are required . . . to review them periodically to ensure their 'continuing appropriateness.'").

The majority reaches its contrary result only by reading both §§ 672(a) and 675(4)(A) selectively, rather than in light of the CWA as a whole. *Cf. Util. Air Regulatory Grp. v. E.P.A.*, 573 U.S. 302, 320 (2014) (reiterating that it is "a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme" (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000))). I agree with the majority that states receiving partial reimbursement pursuant to the CWA must make foster care maintenance payments—without which there would be nothing to reimburse. But our agreement ends there. In my view, it is not reasonable to interpret § 675(4)(A) to impose some minimum spending obligation for each enumerated item on all fifty state foster care systems—much less to locate

---

*may decide which of the costs to include* in the child's foster care maintenance payment." U.S. Dep't of Health & Human Servs., Program Instruction No. ACYF-CB-PI-10-11 at 20, http://perma.cc/9LX9-C76D (emphasis added).

this vast new spending obligation in the "Definitions" section of the CWA.[5] As the Supreme Court reminded us in *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001), Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes," *id.* at 468 (citation omitted); *see also Midwest Foster Care*, 712 F.3d at 1197 ("Finding an enforceable right solely within a purely definitional section is antithetical to requiring unambiguous congressional intent."). So too here.

The majority argues that § 675(4)(A) must specify the precise costs that states are required to pay because, in its view, § 672(a)(1), entitled "Eligibility," provides that participating states "shall make foster care maintenance payments" and specifies "which *foster children* are eligible to have maintenance payments made on their behalf." Maj. Op. at 17–18. But this is wholly consistent with the view that § 672(a)(1) sets out conditions for federal reimbursement—not a spending mandate. It is unsurprising that a statute providing for partial federal reimbursement of a portion of the costs associated with taking care of *some* foster

---

[5] To be clear, my focus here is on the claim at issue. I do not, and need not, opine as to whether there are other circumstances that might give cause for HHS to withhold federal funds to participating states on the ground that inadequate monies were being directed to foster care. It is sufficient to resolve this case to conclude only that §§ 672(a) and 675(4)(a) do not constitute an exhaustive list of mandatory payments that "complying" states "shall make."

11

children (and subject to the state complying with conditions for appropriate placement) would have a section devoted to delineating the category of children whose costs are eligible for reimbursement, and under what conditions. Indeed, the CWA is replete with provisions establishing such eligibility criteria. It is notably lacking, however, *any* provisions that clearly and cleanly mandate a spending minimum that participating states must pay for the items enumerated in § 675(4)(A).

Accordingly, § 672(a)(1) itself devotes far fewer words to the remittance of foster care maintenance payments by states than to factors *curtailing* the situations in which such remittances should be made. As noted, § 672(a)(1) makes clear that such payments are to be made on behalf of children removed from their homes only if removal and placement criteria have been met ("and the placement continues to meet" these criteria), and only then if "the child, while in the home, would [also] have met [specified] AFDC eligibility requirement[s]." Read as a whole, § 672(a)(1) thus "serve[s] as a roadmap for the conditions a state must fulfill in order for its expenditure to be eligible for federal matching funds," *Midwest Foster Care*, 712 F.3d at 1198, but falls well short of establishing an unambiguous spending condition with which states must comply in order to receive federal

money, *cf. Pennhurst*, 451 U.S. at 44 (noting that if "Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously" (citations omitted)).

Indeed, if §§ 672(a)(1) and 675(4)(A) unambiguously imposed a spending obligation on the states in "absolute terms," as the majority would have it, that obligation would surely be easier for the majority to define. If "legislation enacted pursuant to the spending power is much in the nature of a contract," *id.* at 17, what obligation, precisely, did New York take on? An obligation to reimburse all receipts for every item listed in § 675(4)(A) on behalf of a subset of children in foster care? New York warned us that *any* mandated increase in the foster care maintenance payments for which it receives partial reimbursement could result in a decrease in the payments made to the growing percentage of foster parents and other providers who are *not* covered by the CWA. Letter Br. for Def.-Appellee at 22. How much more disruptive to the foster care system, then, would it be to impose an obligation to cover *all* costs for the items listed in § 675(4)(A)? This disastrous result would appear to be the upshot of the majority's view, taken to its

limit, that the CWA commands states to make "payments to cover the cost of" the items listed in § 675(4)(A).

The majority studiously avoids going quite that far. But it does so only by ducking *any* real specification of what the CWA now requires. Thus, the CWA, it says, "give[s] states some discretion as to how to calculate costs and to distribute payments" and courts "may well defer to reasonable exercises of that discretion." Maj. Op. at 25. Yet § 674(A)(4) does not itself contain such qualifications, making it difficult to discern where the majority got them. *Cf. Alabama v. North Carolina*, 560 U.S. 330, 352 (2010) ("We do not—we cannot—add provisions to a federal statute.").

Ultimately, the majority's rejiggering of the CWA results in a curious bargain for New York to have struck—a bargain in which New York supposedly relinquished to federal courts its longstanding control over discretionary judgments about payment rates for foster care providers in exchange for *partial* reimbursement of *some* expenses incurred in the care of a declining percentage of foster care children.[6] The majority characterizes this trade-off as part of a "reasonable bargain" that Congress struck with the states, Maj. Op. at 19, but the

---

[6] See *supra* note 1.

14

states themselves do not appear to agree with that characterization. Fourteen of them have submitted an amicus brief in support of New York's position (and thus against the majority's view). *See* Br. of Amici Curiae States. If these states struck such a bargain, they did so unwittingly. *See Pennhurst*, 451 U.S. at 17 ("The legitimacy of Congress' power to legislate under the spending power . . . rests on whether the State voluntarily and knowingly accepts the terms of the "contract.").

It is perhaps for all the above reasons that the agency tasked with implementing the Act, HHS, has not interpreted §§ 672(a)(1) and 675(4)(A) as imposing a minimum spending mandate on the states for the enumerated items in § 675(4)(A). The definition of "foster care maintenance payments" in HHS regulations promulgated under the CWA tracks § 675(4)(A)'s definition, but the regulation continues: "[l]ocal travel associated with providing the items listed above is *also an allowable expense*."[7] 45 C.F.R. § 1355.20 (emphasis added). This

---

[7] Additional informal guidance serves to buttress this interpretation. To provide another example, the agency also states, in offering guidance on the term "incidentals," as used in § 675(4)(A), that "the reasonable and occasional cost of such items as tickets or other admission fees for sporting, entertainment or cultural events," as well as the cost of "horseback riding" and "Boy/Girl Scout" dues, "*are reimbursable* under Title IV-E Foster Care as a part of the [foster care] maintenance payment." Admin. for Children & Families, U.S. Dep't of Health & Human Servs., Child Welfare Policy Manual §§ 8.3B.1(2), (9) (2018) (emphasis added). It is hard to imagine that Congress *mandated* that the states cover the cost of a foster child's participation in the Boy Scouts, although designating such a cost as reimbursable is entirely reasonable. *See also* U.S. Dep't of Health & Human Servs., Admin. on Children, Youth & Families, Program Instruction No. ACYF-CB-PI-10-

15

language again suggests that § 675(4)(A) simply lists items for which federal reimbursement remains available, not items for which the state is obligated to fully compensate providers. The majority brushes aside HHS's pronouncements, both formal and informal, *see* Maj. Op. at 19 n.2., and I see no need to wade into the various contours of deference to agency interpretations here. Suffice it to say, however, that at the very least, HHS's interpretations of the CWA, embodied both in regulations promulgated through the notice and comment process and in informal guidance, "carr[y] some persuasive force" and therefore "lend[] further support" to New York's position. *Ret. Bd. of the Policemen's Annuity & Benefit Fund v. Bank of N.Y. Mellon*, 775 F.3d 154, 170 (2d Cir. 2014).

## II

But there's a bigger problem with the majority's decision. For even if I'm wrong about the proper interpretation of §§ 672(a)(1) and 675(4)(A)—even if § 672(a)(1) does require states to make payments covering each of the categories of costs enumerated in § 675(4)(A) on behalf of eligible foster children—this requirement would, at most, implicate the federal government's reimbursement

---

11, at 20 (July 9, 2010), http://perma.cc/9LX9-c76D ("As with any cost enumerated in the definition of foster care maintenance payments in [§ 675(4)], the title IV-E agency may decide which of the enumerated costs to include in a child's foster care maintenance payment.").

16

obligations under the Act. The majority concludes, to the contrary, that a subset of New York caregivers have a right, *enforceable under 42 U.S.C. § 1983*, to foster care payments that "cover the cost of (and the cost of providing)" the expenses outlined in § 675(4)(A). This startling conclusion (which has the effect of entitling *some* of the caregivers in a state's foster care system to sue in federal court) is squarely precluded by Supreme Court precedent. I again respectfully disagree with the majority's analysis.

## A

Section 1983 provides a cause of action to remedy violations by state actors of "any rights, privileges, or immunities secured by the Constitution and [federal] laws." 42 U.S.C. § 1983. The Supreme Court has clarified that § 1983 provides a means of redressing "the violation of a federal *right*, not merely a violation of federal *law*." *Blessing v. Freestone*, 520 U.S. 329, 340 (1997) (citation omitted); *see also Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002) ("[I]t is *rights*, not the broader or vaguer 'benefits' or 'interests,' that may be enforced [under § 1983.]"). Moreover, the Court has "rejected the notion" that its precedent "permit[s] anything short of an *unambiguously* conferred right to support a cause of action brought under § 1983." *Gonzaga*, 536 U.S. at 283 (emphasis added).

17

The Court has grown increasingly wary of recognizing new private rights of the sort at issue here, enforceable under § 1983.[8] As the majority well knows, this is particularly true with respect to "legislation enacted pursuant to the spending power," where "the typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the state." *Gonzaga*, 536 U.S. at 280 (quoting *Pennhurst*, 451 U.S. at 28). Clarity as to the existence of a *right* enforceable in a § 1983 action is *especially* important in this context because the right of action itself is a condition on a state's receipt of federal funds, and is thus a significant term in the "contract" to which the state must knowingly and voluntarily agree. *See Suter*, 503 U.S. at 356 (quoting *Pennhurst*, 451 U.S. at 17).

---

[8] The Supreme Court's reticence in the § 1983 context is consistent with the entire swath of its implied rights jurisprudence. *See, e.g.*, *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017) (describing "the notable change in the Court's approach to recognizing implied causes of action" over the past two decades); *Alexander v. Sandoval*, 532 U.S. 275, 287 (2001) (repudiating the "*ancien regime*" practice of creating implied causes of action to effectuate a statute's broader purposes); *Gonzaga*, 536 U.S. at 285 (discussing the Court's implied rights and implied cause of action jurisprudence together and noting that "[a] court's role in discerning whether personal rights exist in the § 1983 context should . . . not differ from its role in discerning whether personal rights exist in the implied right of action context"); *see also* Richard H. Fallon et al., Hart & Wechsler's The Federal Courts and the Federal System 1010 (7th ed. 2015) (observing that the Court's "general tenor . . . has reflected skepticism that Congress intends federal statutes to create 'rights' when it fails to provide statutory remedies").

The Supreme Court has held that Spending Clause legislation created an individually enforceable right under § 1983 in only three cases. *See Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498 (1990); *Wright v. Roanoke Redev. & Hous. Auth.*, 479 U.S. 418 (1987); *Maine v. Thiboutot*, 448 U.S. 1 (1980). The majority cites these cases repeatedly, but glosses over the nearly three decades of case law following *Wilder*, the most recent of the trio, during which time the Supreme Court has never again recognized a private right enforceable under § 1983 in Spending Clause legislation. This trend has not been accidental. As the Court clarified in 2015, "our later opinions plainly repudiate the ready implication of a § 1983 action that *Wilder* exemplified." *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1386 n.* (2015) (citation omitted). The majority criticizes citation to *Armstrong* as "glom[ing] on to one sentence of dicta," but the Court's migration away from recognizing § 1983 rights is both pervasive and undeniable. Indeed, this Court has already conceded as much, *see, e.g.*, *Kapps v. Wing*, 404 F.3d 105, 127 (2d Cir. 2005) (Calabresi, *J.*) (recognizing that "the Court has appeared to be increasingly reluctant to find § 1983–enforceable rights in statutes which . . . set forth their requirements in the context of delineating obligations that accompany participation in federal spending clause programs").

In outlining the Supreme Court's jurisprudence in this area, then, I am not predicting the future but instead faithfully following existing precedent. The Court has *held* that unless Congress "speaks with a clear voice and manifests an unambiguous intent to confer individual rights, federal funding provisions provide *no basis for private enforcement* by § 1983." *Gonzaga*, 458 U.S. at 280 (emphasis added) (internal quotation marks omitted). Given this existing and demanding standard for recognizing a privately enforceable right, the Plaintiff-Appellant took on a challenging task indeed in attempting to demonstrate that the CWA confers on certain New York foster child caregivers the right to bring suit in federal court when they believe they have not been adequately compensated for the items specified in § 675(4)(A).[9] I cannot agree with the majority that the Plaintiff-Appellant has come even close to meeting this challenge.

**B**

The majority structures its analysis around the three *Blessing* factors.[10] At the start, however, I would note that the Supreme Court's more recent

---

[9] I agree with the majority that the Plaintiff-Appellant has standing to assert the rights of these caregivers.

[10] Those three factors are: (1) whether "Congress . . . intended that the provision in question benefit the plaintiff"; (2) whether "the right assertedly protected by the statute is . . . so 'vague and amorphous' that its enforcement would strain judicial competence";

20

jurisprudence calls into question the vitality of the *Blessing* test. In *Gonzaga*, the Court stated that "[s]ome language in our opinions might be read to suggest that something less than an unambiguously conferred right is enforceable by § 1983. *Blessing*, for example, set forth three 'factors' to guide judicial inquiry into whether or not a statute confers a right . . . . We now reject the notion that our cases permit anything short of an unambiguously conferred right to support a cause of action brought under § 1983." 536 U.S. at 260; *see also id.* at 291 (Breyer, *J.*, concurring in the judgment) ("[S]tatute books are too many, the laws too diverse, and their purposes too complex, for any single formula to offer more than general guidance."). Again, contrary to the majority's suggestion, I do not canvas *current* Supreme Court precedent to "read the tea leaves to predict" *future* Supreme Court decisions. Maj. Op. at 16–17. In this Circuit we use the *Blessing* factors to "guide" our analysis but, in recognition of the Supreme Court's existing guidance, we

---

and (3) whether the statute "unambiguously impose[s] a binding obligation on the States"—*i.e.*, whether "the provision giving rise to the asserted right [is] couched in mandatory, rather than precatory, terms." *Blessing*, 520 U.S. at 340–41; *see also Gonzaga*, 536 U.S. at 288–89. If a plaintiff meets this test, thus demonstrating "that [the] federal statute creates an individual right," this creates "a rebuttal presumption that the right is enforceable under § 1983," which the defendant may rebut by showing that Congress "creat[ed] a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." *Blessing*, 520 U.S. at 341.

21

*already* decline to apply these factors mechanistically, "find[ing] a federal right based on [their] rigid or superficial application . . . where other considerations show that Congress did not intend to create federal rights actionable under § 1983." *Torraco v. Port Auth. of New York & New Jersey*, 615 F.3d 129, 136 (2d Cir. 2010) (quoting *Wachovia Bank, N.A. v. Burke*, 414 F.3d 305, 322 (2d Cir. 2005)).

In any event, here, each of the *Blessing* factors presents formidable obstacles for the Plaintiff-Appellant. Though I will not belabor the points, the analysis of the statutory scheme provided in Part I, *supra*, disposes of the first and third *Blessing* factors. Briefly, as to the first factor, whether "Congress . . . intended that the provision benefit the plaintiff," *Blessing*, 520 U.S. at 340, the provisions of the CWA at issue here do not suggest an "unambiguous" focus on benefit to the Plaintiff-Appellant and the subset of foster parents receiving foster care maintenance payments, *Blessing*, 520 U.S. at 340–41. As the Supreme Court noted in *Gonzaga*, "[s]tatutes that focus on the person regulated rather than the individuals protected" do not evince congressional intent to create enforceable rights. *Gonzaga*, 536 U.S. at 287 (quoting *Alexander v. Sandoval*, 532 U.S. 275, 289 (2001)). Thus, the Court cautioned there that provisions outlining the institutional or state actions that would terminate federal funding "cannot make out the

22

requisite congressional intent to confer individual rights enforceable by § 1983."

*Id.* at 288–89. Here, because the relevant provisions of the CWA focus on the *states* rather than the benefitted individuals, the court below ended its analysis with the first *Blessing* factor, concluding that the Plaintiff-Appellant could not surmount even this hurdle. *See New York State Citizens' Coal. for Children v. Carrion*, 31 F. Supp. 3d 512, 527 (E.D.N.Y. 2014) (dismissing claim under first *Blessing* prong and determining that "there is no need to review the other *Blessing* factors"). I discern no error in the district court's able analysis.

As to the third *Blessing* factor: § 675(4)(A), correctly interpreted as listing the state expenditures *eligible* for reimbursement, does not "*unambiguously* impose a binding obligation on the State," *Blessing*, 520 U.S. at 340–41 (emphasis added), to cover the cost of each of the items enumerated in § 675(4)(A). Though the CWA undeniably imposes obligations on the states elsewhere as a precondition for federal funds, the majority errs in locating an unambiguous spending obligation in § 675(4)(A), and thus fails to identify "exactly what is required of States by the Act." *Suter*, 503 U.S. at 358.

I focus principally here on the second *Blessing* factor—that is, whether the asserted right is so deeply "undefined" that its enforcement would "strain judicial

23

competence." *Blessing*, 520 U.S. at 345 (quoting *Livadas v. Bradshaw*, 512 U.S. 107, 132 (1994)). In fact, conscientious consideration of this factor alone is sufficient to establish that Congress did not intend §§ 672(a)(1) and 675(4)(A) to provide individually enforceable rights. *Cf., e.g.*, *Backer ex rel. Freedman v. Shah*, 788 F.3d 341, 344–45 (2d Cir. 2015) (finding, through an analysis of the second *Blessing* factor alone, that a federal provision did not create enforceable rights under § 1983); *Torraco*, 615 F.3d at 137–39 (same). The majority disregards Supreme Court precedent in concluding otherwise, and its ruling will impose on foster care programs within this Circuit an unfortunate and unsupportable risk of "increased litigation, inconsistent results, and disorderly administration," none of which will inure to those programs' benefit. *Armstrong*, 135 S. Ct. at 1389 (Breyer, *J.*, concurring in part and concurring in the judgment).

The Plaintiff-Appellant seeks to enforce through § 1983 an alleged federal right of certain New York foster child caregivers to receive "foster care maintenance payments" under 42 U.S.C. §§ 672(a)(1) and 675(4)(A). No one disputes that New York *does* provide such payments—the Plaintiff-Appellant's actual grievance is that the payments are not, on average, large enough. Put another way, the Plaintiff-Appellant insists that New York's foster care

24

maintenance payments do not "cover the cost of (and the cost of providing)" each of the items listed in § 675(4)(A), and that New York caregivers receiving inadequate payments have a § 1983 right to sue for the deficiency.

This argument raises the threshold question of how to calculate "the cost of (and the cost of providing)" the items listed in § 675(4)(A).  The Plaintiff-Appellant essentially contends that there is an objective "cost" to each of the enumerated items, and that New York caregivers receiving foster care maintenance payments have a § 1983 right to payments sufficient to cover that "cost."  Relying on a 2007 study by the National Foster Parent Association, Children's Rights and the University of Maryland School of Social Work ("the 2007 Study"),[11] the Plaintiff-Appellant's complaint alleges that New York's foster care maintenance payments fail to cover the "cost" of the § 675(4)(A) items by as much as 43%.  The Plaintiff-Appellant also claims that by consulting "readily available data" on the cost of the enumerated items, calculating the amount that these caregivers *should* be paid involves "nothing more than basic arithmetic."  Br. for Pl.-Appellant at 33.  The majority largely concurs, arguing that settling upon the appropriate payments is

---

[11] Children's Rights et al., *Hitting the M.A.R.C.: Establishing Foster Care Minimum Adequate Rates for Children, Technical Report* (2007), http://www.childrensrights.org/wp-content/uploads/2008/06/hitting_the_marc_summary_october_2007.pdf.

both a judicially administrable task and one requiring "only very limited review of policy determinations." Maj. Op. at 25.

These assertions do not withstand even minimal scrutiny. In reality, calculating the "cost" of the § 675(4)(A) items implicates numerous and difficult policy judgments about foster care and childrearing, not to mention overall program administration, that federal judges are ill equipped to make and that go *entirely unaddressed* in the statute that the majority interprets to unambiguously require such judgments. The Plaintiff-Appellant points to the 2007 Study as a benchmark for performing these cost calculations. But even a cursory examination of this study reveals how arbitrary the administration of § 675(4)(A) by federal judges would likely be.

As an initial matter, the 2007 Study bases its cost estimates on survey data from a Consumer Expenditure Survey of the Bureau of Labor Statistics of the United States Department of Labor, which is a *national* survey of household expenditures. Yet the Plaintiff-Appellant's own submissions imply that state foster care maintenance rates should be at least state, if not county-specific. *See* Br. for Pl-Appellant at 4 (protesting that New York's "foster care maintenance payment rates rank below those of States where the cost of living is significantly

lower"). Whether and how a state should take account of geography in setting its maintenance rates is not addressed in the CWA and is certainly not a question of "basic arithmetic."

Furthermore, the 2007 Study's recommended payment rates do not vary based on a family's income level. *See* 2007 Study at 40. Instead, the 2007 Study creates a uniform maintenance rate based on the national spending habits of *middle-income* families, on the assumption that the spending habits of these families represent an accurate cost estimate for all families. *Id.* at 21. Yet the "cost" of a § 675(4)(A) item may vary based on a given family's income.[12] Should family income level affect the payment to which a subset of a state's foster child caregivers are entitled? The majority does not provide an answer. Nor does the CWA. Finally, the 2007 Study addresses only a "basic" foster care rate and does not even attempt to calculate the costs of caring for a foster child with special needs, including both physical disabilities and emotional difficulties. *See id.* at 2 n.1. So what is a judge to do, when the CWA itself contains nothing "sufficiently specific

---

[12] For instance, as the State Amici note, "in the urban Northeast, food estimates for expenditures on children ages 12–14 in a two-parent family making more than $106,000 annually were $3,420," while "[e]stimates show that the same family composition making less than $61,680 spent only $2,340"—a difference of over $1,000. Br. of Amici Curiae States at 26–27.

27

and definite," *Wright*, 479 U.S. at 432, to guide the court's evaluation of any rate on which a state might settle for this important category of children?

The above-listed issues provide just a sampling of the problems inherent in recognizing a § 1983 right in §§ 672(a)(1) and 675(4)(A) of the CWA. This sampling is enough to show that it is fanciful to claim that Congress manifested in the CWA an unambiguous intent to confer on a subset of foster child caregivers this private right of action, with nary a statutory word as to the criteria to be used in reaching judgments about whether a state's payments for the items enumerated in § 675(4)(A) are sufficient. The Supreme Court has been particularly reluctant to conclude that a federal cause of action exists where, as here, the required remedy would entail judicial ratemaking, given that "[t]he history of ratemaking demonstrates that administrative agencies are far better suited to this task than judges." *Armstrong*, 135 S. Ct. at 1388 (Breyer, *J.*, concurring in part and concurring in the judgment). Still less are federal courts suited for this rate-setting task in the family-relations sphere, a "traditional area of state concern." *See Moore v. Sims*, 442 U.S. 415, 435 (1979); *see also Thompson v. Thompson*, 484 U.S. 174, 186 (1988) (holding that the Parental Kidnapping Prevention Act did not create a private cause of

action enforceable in federal court because doing so would "entangle[] [federal courts] in traditional state-law questions that they have little expertise to resolve").

The majority, likely cognizant of the irregular role it today forces upon federal judges, remains somewhat evasive about the precise contours of the § 1983 right that it recognizes. The right seems to "require" courts "to review how a state ha[s] determined the amounts it pays, including how it has quantified the costs of the specific expenses listed in Section 675(4)." Maj. Op. at 25. But the majority never specifies what this review should look like. At times, the majority implies that a subset of New York foster parents have a § 1983 right to require New York simply "to quantify costs for set expenses." *Id.* at 25. At other moments, the majority suggests that federal courts must engage in a *substantive* review of a state's foster care payment scheme, *id.* at 24, but it notably demurs from informing lower courts what this "very limited review" entails. In sum, this vague analysis is a far cry from the careful "methodical inquiry" that the Supreme Court expects from lower courts when they discern § 1983 rights in federal legislation. *See Blessing*, 520 U.S. at 343.

Whatever the majority's good intentions, exposing New York's foster care system to amorphous § 1983 claims that are not contemplated in the CWA is no

29

way to further the CWA's goals, nor to benefit foster care systems more generally.

Indeed, the majority's decision raises the prospect that scarce foster care resources, instead of going to foster children, will be squandered in litigation destined to produce arbitrary and inconsistent results.[13]  As the *Blessing* Court reminds us, when an asserted right is sufficiently amorphous that its "enforcement would strain judicial competence," this is a clear indication that Congress did not intend to create such a right.  *See Blessing*, 520 U.S. 329 at 341 (quoting *Livadas*, 512 U.S. at 132).  Such is the case here.

## C

In its hurried desire to create a right enforceable under § 1983, the majority also misconstrues the controlling precedent provided by the Supreme Court's 2015 *Armstrong* decision.  The majority observes that "[t]he only federal review provided under the [CWA] is review by the Secretary for substantial conformity . . . , with the possibility of funding cutoffs as the sole remedy."  Maj. Op. at 29.  According to the majority, this limited remedy signifies that Congress

---

[13] The beneficiaries of the majority's scheme therefore may not be foster care parents or other caregivers, but the attorneys who bring claims on their behalf. *See* 42 U.S.C. § 1988(b)(2) (providing that "[i]n any action or proceeding to enforce a provision of [§1983], the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the cost . . . .").

did not intend to foreclose private enforcement of §§ 672(a)(1) and 675(4)(A). But *Armstrong* dictates the opposite conclusion: when Congress passes a statute that is "judicially unadministrable," and the "sole remedy" for a state's noncompliance is the Secretary's withholding of funds, Congress has manifested an intent for "the agency remedy that it provided [to be] exclusive." *Armstrong*, 135 S. Ct. at 1385 (quoting *Gonzaga*, 536 U.S. at 292 (Breyer, *J.*, concurring in the judgment)).

In *Armstrong*, private plaintiffs attempted to sue in equity to enforce § 30A of the Medicaid Act. *See id.* That section mandated that state Medicaid plans provide payments to hospitals that were "consistent with efficiency, economy, and quality of care" while "safeguard[ing] against unnecessary utilization of . . . care and services." 42 U.S.C. § 1396a(a)(30)(A). The Medicaid Act also specified that a federal agency should withhold funds from states that fail to meet this detailed mandate. *Id.* § 1396c. The Court concluded, based on "[t]he sheer complexity associated with enforcing § 30(A), coupled with the express provision of an administrative remedy," that the Medicaid Act "precludes private enforcement of § 30(A) in courts." *Armstrong*, 135 S. Ct. at 1385. Instead, the Court determined that the "judgment-laden" § 30A demonstrated a congressional desire to "achiev[e] the expertise, uniformity, widespread consultation, and resulting

31

administrative guidance that can accompany agency decisionmaking," while "*avoiding* the comparative risk of inconsistent interpretations and misincentives that can arise out of an occasional inappropriate application of the statute in a private action." *Id.* (emphasis added) (quoting *Gonzaga*, 536 U.S. at 292 (Breyer, J., concurring in the judgment)).

*Armstrong* squarely controls our case. Not only does defining "the cost of" all the § 675(4)(A) items require myriad policy choices that have no legal answer, as in *Armstrong*,[14] but the Medicaid Act and CWA also have near-identical enforcement schemes. Under the CWA, HHS must issue regulations specifying criteria to determine whether a state is in substantial conformity with the CWA and may ultimately withhold funding from states that do not meet these standards. Similarly, under the Medicaid Act, "the sole remedy Congress provided for" was "the withholding of Medicaid funds by" HHS. *Armstrong*, 135 S. Ct. at 1385.

---

[14] Contrary to the majority's assertion, §§ 672(a)(1) and 675(4)(A) of the CWA are even more indeterminate than § 30(A) of the Medicaid Act because § 30(A)—unlike §§ 672(a)(1) and 675(4)(A)—at least provides *some* criteria for setting payment rates. *See* 42 U.S.C. § 1396a(30)(A) (specifying that payments be "consistent with efficiency, economy, and quality of care," while "safeguard[ing] against unnecessary utilization of . . . care and services").

32

The majority attempts to distinguish *Armstrong* by noting that *Armstrong* concerned a suit in equity rather than a suit under § 1983. But it is *harder* for a private plaintiff to enforce a federal provision under § 1983 than it is for that plaintiff to enforce a federal provision by suing to enjoin allegedly unlawful actions, as the *Armstrong* plaintiffs sought to do. *See Armstrong*, 135 S. Ct. at 1392 (Sotomayor, *J.*, dissenting).; *id.* at 1384 (majority opinion). Such a plaintiff, seeking to enforce a provision in equity, benefits from a presumption that an equitable cause of action exists and that Congress did not intend to foreclose such a cause of action. *Id.*; *see also id.* at 1384–86 (majority opinion). A plaintiff seeking to enforce a provision under § 1983, however, faces the opposite presumption: a plaintiff "must demonstrate specific congressional intent to *create*" an enforceable right. *Id.* at 1392; *see also Gonzaga*, 536 U.S. at 286. For this reason, the plaintiffs in *Armstrong* did not even attempt to enforce § 30(A) pursuant to § 1983; if they could not enforce the provision in equity, *a fortiori*, they could not do so pursuant to a § 1983 theory like the one relied on here. [15] *See Armstrong*, 135 S. Ct. at 1386 n.*; *id.* at 1392

---

[15] The majority argues that it must be easier to bring a claim under § 1983 than in equity because Congress passed § 1983 to create an additional means by which "plaintiffs [can] sue the government for civil rights violations." Maj. Op. at 30–31. But its comparison is inapt. Section 1983 provides different *remedies* against different *defendants* for civil rights violations, unavailable in equity. It is precisely because of the "variety of remedies— including damages—[available] from a broad range of parties" under § 1983 that a

(Sotomayor, *J.*, dissenting). Any distinctions between this case and *Armstrong*, then, actually hurt the Plaintiff-Appellant.

## D

Rather than acknowledging the controlling weight of the Court's *Armstrong* precedent, the majority invokes out-of-circuit case law, as well as two cases—each three decades old—in which the Supreme Court held that Spending Clause legislation provided a source of individually enforceable rights. *See Wright*, 479 U.S. at 418; *Wilder*, 496 U.S. at 498. The majority's approach to the slim precedent on which it *does* rely is flawed for at least four reasons.

First, as explained above, the Court has stated on more than one occasion that "the ready implication of a § 1983 action that *Wilder* exemplified" has been "repudiate[d]" by more recent precedent. *See Armstrong*, 135 S. Ct. at 1386 n.* (citing *Gonzaga*, 536 U.S. at 283). Thus, *Wilder*'s precedential value (along with

---

plaintiff "invoking § 1983" cannot "simply point[] to background equitable principles authorizing the action," but must instead "demonstrate specific congressional intent to *create* a statutory right." *Armstrong*, 135 S. Ct. at 1392 (Sotomayor *J.*, dissenting); *see also Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 119 (1989) (Kennedy *J.*, concurring) (noting that equity does "not limit jurisdiction to those who can show the deprivation of a right, privilege, or immunity secured by federal law within the meaning of § 1983").

*Wright*'s) is limited at best.[16] *See Does v. Gillespie*, 867 F.3d 1034, 1040 (8th Cir. 2017) ("Later decisions, however, show that the governing standard for identifying enforceable federal rights in spending statutes is more rigorous [than *Wilder*] . . . . [T]he Court's 'repudiation' of *Wilder* is the functional equivalent of 'overruling,' as the Court uses the terms interchangeably.").

Second, even ignoring their precarious status as precedent, *Wright* and *Wilder* involved statutory provisions that were notably different from those at issue here. The majority's approach to the CWA here echoes that of the Sixth and Ninth Circuits, which have both concluded that §§ 672(a)(1) and 675(4)(A) are judicially administrable under § 1983 because courts can assess the states' rate calculations for "reasonable[ness]." Maj. Op. at 25–26; *D.O. v. Glisson*, 847 F.3d 374, 380 (6th Cir. 2017); *Cal. State Foster Parent Ass'n v. Wagner*, 624 F.3d 974, 981 (9th Cir. 2010). Yet "[i]n both *Wright* and *Wilder* the word 'reasonable' occupied a prominent place in the critical language of the statute or regulation."[17] *Suter*, 503

---

[16] Although our Circuit determined in *Briggs v. Bremby*, 792 F.3d 239, 244 (2d Cir. 2015) (Calabresi J.,), that *Wright* and *Wilder* are still good law, *Briggs* did not cite *Armstrong*, nor did it address *Armstrong*'s disavowal of *Wilder*.

[17] *Wilder* involved the (since-repealed) Boren Amendment, 42 U.S.C. § 1396a(a)(13)(A), which required a state plan for medical assistance to provide payments "which the State finds, and makes assurances satisfactory to the Secretary, *are reasonable and adequate*." 496 U.S. at 502–03 (emphasis removed). And *Wright* involved a regulation requiring state

35

U.S. at 357. By contrast, the word "reasonable" is entirely absent from § 672(a)(1), the relevant provision of the CWA. *Cf. Armstrong*, 135 S. Ct. at 1389 (Breyer, *J.*, concurring in part and concurring in the judgment) (distinguishing statutes that require courts to review rates for "reasonableness," which are administrable, from those that require courts "to engage in [] direct rate-setting," which are not). Given that the ultimate inquiry in this case is one of congressional intent, and *unambiguous* intent at that, the majority should not follow the Sixth and Ninth Circuits in improperly rewriting the text of the CWA. *Cf. E.P.A. v. EME Homer City Generation, L.P.*, 134 S. Ct. 1584, 1601 (2014) ("[A] court's task is to apply the text of [a] statute, not to improve upon it." (quoting *Pavelic & LeFlore v. Marvel Entm't Grp.*, 493 U.S. 120, 126 (1989))).

Third, in both *Wright* and *Wilder*, the relevant statute and regulations provided detailed guidance to the states as to how they should calculate the rates in question.[18] *See Wilder*, 496 U.S. at 519; *Wright*, 479 U.S. at 431–32; *see also Suter*,

---

public housing authorities to impose a ceiling on the rent charged to low-income tenants that took into account, among other things, "*reasonable* amounts of utilities." 479 U.S. at 419–21 & n.3 (emphasis added).

[18] That said, the Court would probably now hold that the *statute*, rather than its implementing regulations, must provide an adequate benchmark; the existence of a right enforceable pursuant to § 1983 is a matter of Congressional rather than agency intent. *Cf. Alexander*, 532 U.S. at 291 ("Language in a regulation may invoke a private right of action

503 U.S. at 359 (noting that the Court in *Wilder* "relied in part on the fact that the statute and regulations set forth in some detail the factors to be considered in determining the methods for calculating rates"). As a result, in *Wright* and *Wilder*, a reviewing federal court had some objective benchmark for evaluating state rates. Sections 672(a)(1) and 675(4)(A), by contrast, provide *no* guidance as to how a state should calculate its rates, nor do HHS's regulations.

Finally, as the Eighth Circuit has noted, "unlike the CWA sections at issue here, the relevant provisions in the Medicaid Act [at issue in *Wilder*] did not focus on defining the conditions that must be met in order for a participating state's expenditures to be eligible for federal matching funds and, therefore, did not evince the degree of removal [from the provision's purported beneficiaries] we now confront." *Midwest Foster Care*, 712 F.3d at 1199; *see also Wright*, 479 U.S. at 420 (finding individual right to claim rent overcharges under a statute that provided that "[a] family shall pay as rent the highest of" specifically defined amounts). In sum, then, the CWA does not even meet the lenient standard for articulating an enforceable right that was set during what the Court has characterized as its

that Congress through statutory text created, but it may not create a right that Congress has not."). This is yet another reason why neither *Wilder* nor *Wright* controls here.

"*ancien regime*" of implied rights jurisprudence. *Alexander*, 532 U.S. at 287. It certainly cannot meet the more exacting test the Court now employs.

\* \* \*

Statutes enacted under the Spending Clause create privately enforceable rights under § 1983 only if they do so "unambiguously." *See Gonzaga*, 536 U.S. at 280. Courts demand this level of clarity out of respect for congressional drafters and state legislators, both of whom are equal parties to the statutory "contract." *See Barnes v. Gorman*, 536 U.S. 181, 186 (2002) (quoting *Pennhurst*, 451 U.S. at 17). Here, Congress did not provide for private enforcement of §§ 672(a)(1) and 675(4)(A) pursuant to § 1983—unambiguously or otherwise. The states, for their parts, did not agree to subject their foster care programs to the continuous review of federal courts in § 1983 litigation—litigation that will impose on these programs the burdens of both incessant suit *and* unpredictable outcomes. The majority's decision today is inconsistent with controlling precedent and fails to give the choices made by Congress and the states in the CWA the respect they deserve. I respectfully—but firmly—dissent.